UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| THE EXTRADITION OF | ) | Case No. 20-mj-1069-DLC |
| MICHAEL L. TAYLOR | ) | |
| | ) | |
| | ) | |
| IN THE MATTER OF | ) | |
| THE EXTRADITION OF | ) | Case No. 20-mj-1070-DLC |
| PETER M. TAYLOR | ) | |

**GOVERNMENT'S OPPOSITION TO MICHAEL TAYLOR AND PETER TAYLOR'S
MOTION TO QUASH ARREST WARRANTS OR FOR RELEASE FROM DETENTION**

## **TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………..…..1

BACKGROUND……………………………………………………………...…..…….4

    I. STATEMENT OF THE FACTS………………………………………….….…...…4

    II. PROCEDURAL HISTORY…………………………………………….……......…5

        A. Proceedings in Japan…………………………………………….…….....…5

        B. Proceedings in the United States……………………………………….……5

    III. LEGAL BACKGROUND……………………………………………………..…6

ARGUMENT………………………………………………………………….…..……8

    I. THE TAYLORS SHOULD REMAIN DETAINED BECAUSE THEY ARE A FLIGHT RISK AND NO SPECIAL CIRCUMSTANCES WARRANT THEIR RELEASE……………………………………………...…..………………………..9

        A. The Taylors should be detained because they present a clear risk of flight……………………………………………………………………………9

            1. The Taylors' facilitation of Ghosn's escape demonstrates their aptitude for evading law enforcement and disregard for bond conditions……...………..9

            2. The Taylors concede they have strong ties to Middle Eastern countries that have no extradition treaty with Japan or the United States…………………………………………………………………….....9

            3. Michael Taylor is a convicted felon who was previously found to be a flight risk and danger to the community………………………...…………….....10

            4. The Taylors have the resources to flee……………….…………….....…12

            5. The Taylors' arguments are insufficient to overcome the facts evidencing their exceptional flight risk……………………………………………….12

        B. There are no special circumstances warranting the Taylors' release……..……….14

            1. The Taylors have not established a high likelihood of success on the merits of their claims, even if this factor were considered a special circumstance…………………………………………………….......…14

            2. The Taylors' claims regarding purported Lebanese proceedings do not constitute a special circumstance…………………………………...………15

            3. The Taylors' family circumstances do not warrant their release………….16

            4. COVID-19 is not a basis for the Taylors' release…………………………17

                a. COVID-19 is not a special circumstance unique to the Taylors…………………………………………..……...………...17

                b. The Taylors have not shown that Norfolk's precautions have been inadequate……………………………………………..………....18

            5. The Taylors have not created a special circumstance by combining their claims that individually are not special circumstances…………………………...…...…20

    II. THE COURT PROPERLY ISSUED THE ARREST WARRANTS AND THE TAYLORS' MOTION TO QUASH THEM SHOULD BE DENIED…………..…….…20

        A. The Court did not err in issuing the arrest warrants based on the government's sworn and detailed Complaints………………………………..……….…20

        B. The Taylors' claims are premature and meritless……………………..……….…22

            1. The Taylors will have ample opportunity to assert their defenses at the extradition hearing………………………………………………..…..…22

2. Regardless, the Taylors' defenses are meritless…………………………24

    a. The Court must defer to Japan on issues of pure Japanese law……………………………………………………………...……24

    b. In any event, Japan has explained why the Taylors' claims are meritless and the Japanese arrest warrants confirm this fact…….....…25

        i. The Japanese arrest warrants include the felony offense for which Japan requested the Taylors' provisional arrests……25

        ii. Article 103 covers the Taylors' alleged facilitation of Ghosn's escape………………………………………...…………..…..27

3. The Taylors' probable cause arguments do not save their premature and meritless claims…………………………………………………………...…31

    a. The government has satisfied any probable cause requirement for the Taylors' provisional arrests.…………………………………...…31

    b. In any event, the probable cause requirement for provisional arrests is distinct from the standard applied in domestic criminal arrests…………………………………………………………..…33

        i. The Treaty supports a distinct standard for provisional arrests.……………………………………………………..34

        ii. The Fourth Amendment does not compel a different result…………………………...………………………35

CONCLUSION………………………………………………….………………39

# TABLE OF AUTHORITIES

## Cases

*Austin v. Healey*, 5 F.3d 598 (2d Cir. 1993) ........................................................................21

*Basic v. Steck*, 819 F.3d 897 (6th Cir. 2016) ......................................................................24

*Borodin v. Ashcroft*, 136 F. Supp. 2d 125 (E.D.N.Y. 2001) ................................................13

*Boyer v. United States*, 14-cr-10163, 2020 WL 1978190 (D. Mass. Apr. 24, 2020) .................17

*Caltagirone v. Grant,* 629 F.2d 739 (2d Cir. 1980) ...............................................23, 32, 35, 38

*United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49 (D. Mass. 2010) .............................8, 14

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) ...........................................................38

*Emami v. United States Dist. Court*, 834 F.2d 1444 (9th Cir.1987) ........................................24

*Factor v. Laubenheimer*, 290 U.S. 276 (1933) .....................................................................35

*First Nat'l City Bank v. Aristeguieta*, 287 F.2d 219 (2d Cir. 1960) ..........................................7

*Gerstein v. Pugh*, 420 U.S. 103 (1975) ..........................................................................31, 36

*Grin v. Shine*, 187 U.S. 181 (1902) ...............................................................................24, 35

*Hilton v. Kerry*, 754 F.3d 79 (1st Cir. 2014) ........................................................................31

*In Matter of Extradition of Pineda Lara,* Case No. 97–Cr.–Misc.–1, 1998 WL 67656 (S.D.N.Y. Feb. 18, 1998) .......................................................................................................................23

*In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 466 F. Supp. 2d 1020 (N.D. Ill. 2006) ......................................................................25

*In re Assarsson*, 635 F.2d 1237 (7th Cir. 1980) ....................................................................25

*In re Extradition of Blasko*, No. 1:17-MC-00067, 2018 WL 6044921 (E.D. Cal. Nov. 19, 2018) ............25

*In re Extradition of Boeyink*, 2004 WL 6074945 (E.D. Va. Jan. 28, 2004) .........................................32, 33

*In re Extradition of Gohir*, No. 2:14-mj-00314, 2014 WL 2123402 (D. Nev. May 21, 2014) ...........22, 32

*In re Extradition of Howard*, 996 F.2d 1320 (1st Cir. 1993).................................................................7, 35

*In re Extradition of Nezirovic*, No. 7:12-mc-39, 2013 WL 5202420 (W.D. Va. Sept. 16, 2013) ..............25

*In re Extradition of Russell,* 805 F.2d 1215 (5th Cir. 1986).......................................................................33

*In re Extradition of Schumann*, No. 18 CR 283, 2018 WL 4777562 (N.D. Ill. Oct. 3, 2018)...................25

*In re Extradition of Skaftouros*, 643 F. Supp. 2d 535 (S.D.N.Y. 2009) ..........................................7, 22, 23

*In re Garcia*, 615 F. Supp. 2d 162 (S.D.N.Y. 2009) .................................................................................38

*In re Santos*, 473 F. Supp. 2d 1030 (C.D. Cal. 2006) ...............................................................................14

**In re the Matter of Extradition of** *Beresford-Redman*, No. CR 10-2780M, 2010 WL 5313494 (C.D. Cal.

Dec. 17, 2010)......................................................................................................................................32, 33

*In the Matter of the Extradition of Drumm*, 150 F. Supp. 3d 92 (D. Mass. 2015) ......................8, 12, 16, 19

*In the Matter of the Extradition of Hilton*, No. 13-7043, 2013 WL 1891327 (D. Mass. May 3, 2013) ..........7

*In the Matter of the Extradition of Koskotas*, 88–MJ-73, 127 F.R.D. 13 (D. Mass. July 13, 1989)...............22

*In the Matter of the Extradition of Lui*, 913 F. Supp. 50 (D. Mass. 1996) .................................................14

*In the Matter of the Extradition of Martinelli*, 263 F. Supp. 3d 1280 (S.D. Fla. 2017) ................................13

In *United States v. Ramnath.* 533 F. Supp. 2d 662 (E.D. Tex. 2008).....................................................14

*Jimenez* v. *Quarterman*, 555 U.S. 113 (2009) ........................................................................................28

*Koskotas v. Roche*, 931 F.2d 169 (1st Cir. 1991) ..............................................................................7, 25

*Lo Duca v. United States*, 93 F.3d 1100 (2d Cir. 1996) ..................................................................16, 37

*Lo Duca v. United States*, No. 95-cv-713, 1995 WL 428636 (E.D.N.Y. July 7, 1995)............................16

*Man-Seok Choe v. Torres*, 525 F.3d 733 (9th Cir. 2008) ......................................................................12

*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978) ...................................................................36

*Martin v. Warden*, 993 F.2d 824 (11th Cir. 1993) ...............................................................37

*Martinez v. United States*, 828 F.3d 451 (6th Cir. 2016)................................................23, 35

*Matter of Extradition of Hamilton–Byrne,* 831 F. Supp. 287 (S.D.N.Y. 1993)...........................38

*Melia v. United States*, 667 F.2d 300 (2d Cir. 1981)..............................................................25

*Neely v. Henkel*, 180 U.S. 109, (1901) .................................................................................30

*Noeller v. Wojdylo*, 922 F.3d 797 (7th Cir. 2019)..................................................................24

*Parretti v. United States*, 122 F.3d 758 (9th Cir. 1997) ........................................................32

Parretti V. United States, 143 F.3d 508 (9th Cir. 1998) ...............................................32, 38

*Patterson v. Wagner*, 785 F.3d 1277 (9th Cir. 2015)...............................................................15

*Perrin* v. *United States*, 444 U.S. 37 (1979).........................................................................29

*Plum Creek Lumber Co. v. Hutton*, 608 F.2d 1283 (9th Cir. 1979)........................................36

*Risner v. Fowler*, No. 3:19-CV-03078, 2020 WL 2110579 (N.D. Tex. May 1, 2020).......................13, 17

*Sahagian v. United States,* 864 F.2d 509 (7th Cir. 1988).........................................................33

*Sainez v. Venables*, 588 F.3d 713 (9th Cir. 2009) .................................................................24

*Sandifer* v. *United States Steel Corp.*, 134 S. Ct. 870 (2014) ...................................................29

*Schmeer v. Warden of Santa Rosa Cty. Jail*, No. 3:14-cv-285, 2014 WL 5430310 (N.D. Fla. Oct. 22, 2014)

.............................................................................................................................25

*Skaftouros v. United States*, 667 F.3d 144 (2d Cir. 2011) ........................................................7

*Taniguchi* v. *Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997 (2012).................................................29

*United States v. Acherman*, No. 15-10046, 2015 WL 4576926 (D. Mass. July 30, 2015) .......................12

*United States v. Diaz*, 20-cr-10035, 2020 WL 1974257 (D. Mass. Apr. 23, 2020)..................................17

*United States v. Guzman*, 15-cr-10338, 2020 WL 1974332 (D. Mass. Apr. 24, 2020) ............................17

*United States v. Kin-Hong*, 110 F.3d 103 (1st Cir. 1997) ....................................................................passim

*United States v. Kin-Kong*, 83 F.3d 523 (1st Cir. 1996) ....................................................................passim

*United States v. Leitner*, 784 F.2d 159 (2d Cir. 1986) ..........................................................................13

*United States v. Mackenzie*, 13-10149, 2020 WL 2104786 (D. Mass. May 1, 2020) ..................................17

*United States v. Michael L. Taylor*, 2:12-cr-645 (D. Utah) ........................................................................10

*United States v. Michael Taylor*, 12-cr-00502, Docket No. 351 (D. Utah Aug 22, 2013) ...................10, 11

*United States v. Oladimu*, 1:01-cr-10198, 2020 WL 1866253 (D. Mass. Apr. 14, 2020) .........................17

*United States v. Perez*, 15-10256, 2020 WL 1991161 (D. Mass. Apr. 22, 2020) ......................................17

*United States v. Risner*, No. 3:18-MJ-765-BN, 2018 WL 6809796 (N.D. Tex. Dec. 27, 2018)...............14

*United States v. Snyder*, No. 13-7082, 2013 WL 1364275 (April 3, 2013) ...............................................16

*United States v. Spatola*, No. 89-643-M (JLC), 1989 WL 62993 (E.D.N.Y. June 9, 1989) ...............27, 32

*United States v. Tang Yee–Chun,* 657 F. Supp. 1270 (S.D.N.Y. 1987)......................................................23

*United States v. Taylor*, Case Nos. 12-4186 & 12-4187, 2013 WL 2466627 (10th Cir. June 10, 2013) ....10

*United States v.* Wiebe, 733 F.2d 549 (8th Cir. 1984)...........................................................................38

*United States v. Yassine*, 574 F. App'x 455 (5th Cir. 2014) ...................................................................13

*Valentino v. United States Marshal*, No. 4:20-cv-304, 2020 WL 1950765 (S.D. Tex. Apr. 15, 2020)........17

*Vo v. Benov,* 447 F.3d 1235 (9th Cir. 2006) ........................................................................................15

*Ward v. Rutherford*, 921 F.2d 286 (D.C. Cir. 1990) ..............................................................................37

**Statutes**

18 U.S.C § 1512..........................................................................................................................31

18 U.S.C § 1621..........................................................................................................................31

18 U.S.C. § 1001 ...................................................................................................................31

18 U.S.C. § 3184 ...........................................................................................................passim

18 U.S.C. § 3186 .....................................................................................................................7

## Other Authorities

Commercial Act and the Corporation Tax Act ......................................................................28

Immigration Control and Refugee Recognition Act (Article 71, 25 II) ..................................26, 27

Japanese Penal Code, Article 103 ...............................................................................passim

Japanese Penal Code, Article 63 ...........................................................................................30

Japanese Penal Code, Article 97 .....................................................................................29, 30

Japanese Penal Code, Article 98 .....................................................................................29, 30

Treaty on Extradition Between the United States of America and Japan, U.S.-Japan, Mar. 26, 1980, 31

U.S.T. 892 ......................................................................................................................passim

U.S. Const. amend. IV ...................................................................................33, 35, 38, 39

## Rules

Rules for United States Magistrates Judges in the United States District Court for the District of

Massachusetts, Rule 1(e) ...............................................................................................21

**INTRODUCTION**

The United States, through Assistant United States Attorney Stephen W. Hassink, opposes the motion filed by Michael Taylor and Peter Taylor to quash their arrest warrants or, alternatively, to be released from detention during the extradition proceedings.  Docket No. 17 ("Motion").[1]

This much is undisputed:  Japan requested the Taylors' provisional arrests under Article IX of the extradition treaty between Japan and the United States (the "Treaty").[2]  In accordance with its Treaty obligations, the government submitted sworn Complaints in which the undersigned averred that the Taylors had been accused in Japan with violating, *inter alia*, Article 103 of the Japanese Penal Code and that the Tokyo District Court had issued arrest warrants for the Taylors.  The Complaints also provided a detailed description of the facts upon which the Japanese arrest warrants were issued.  Specifically, the Taylors are alleged to have entered Japan's sovereign territory for the sole purpose of enabling the escape of one of that country's most well-known criminal defendants—Carlos Ghosn Bichara ("Ghosn")—who was under indictment for financial crimes and had been released on bail pending trial.

Relying on the sworn and detailed Complaints, as courts routinely do, this Court properly issued warrants for the Taylors' provisional arrests.  Nothing in the Taylors' Motion warrants reversal of the Court's decision or their release from detention during the extradition proceedings.

*First*, the Taylors do not come close to carrying their heavy burden to show by clear and convincing evidence that they are not flight risks and that special circumstances warrant their release. The Taylors stand accused of masterminding a high-risk and complex operation to smuggle Ghosn out

---

[1] Unless otherwise specified, all citations to the record in this Opposition refer to both case number 4:20-mj-1069 and case number 4:20-mj-1070.  The government filed substantially similar complaints in both actions, *see* Docket No. 1, and they will collectively be referred to herein as the "Complaints."

[2] *See* Treaty on Extradition Between the United States of America and Japan, U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892.  A copy of the Treaty is attached hereto as Exhibit A.

of Japan through the use of a private jet, bullet train travel, multiple hotel rooms in different cities, and two large black boxes, one of which was used to conceal Ghosn. Logic dictates that the Taylors would go to even greater lengths to avoid their own prosecution. Moreover, the Taylors, themselves, admit that they have extensive family and business ties to the Middle East, including Lebanon, which has no extradition treaty with either Japan or the United States, and where they would presumably enjoy free range if their representation that they have somehow been exonerated in that country is correct. Critically, Michael Taylor was previously found to be a flight risk and danger to the community when he was being prosecuted for felony offenses in a domestic case that ultimately led to his guilty plea. The alleged facts of the instant matter demonstrate that little has changed since that time. In any event, the Taylors have not shown, as they must, that any special circumstances unique to them warrant their release.

*Second*, the Taylors' Motion to Quash the arrest warrants issued by this Court rest on premature and meritless claims. Noticeably absent from the Motion is any contest of the fact that the Taylors extracted Ghosn from Japan. Instead, the Taylors ask this Court to take the unprecedented step of relying on their flawed interpretation of Japanese law and a mischaracterization of the facts to quash the warrants it properly issued. As a threshold matter, the Motion is premature because it precedes Japan's submission of its formal extradition request. As the Treaty and caselaw make clear, that will be the appropriate time for Japan to submit its explanation of the Japanese law that the Taylors allegedly violated and to provide its supporting evidence. Pursuant to statute, the Taylors will then have a full and fair opportunity to contest extradition on any grounds that fall within the limited scope of an extradition hearing. The Taylors have cited no case, and the government is aware of none, holding that a judicial officer must first parse a fugitive's motion and exhibits exceeding 100 pages, and then adjudicate disputed issues of foreign law, in order to issue provisional arrest warrants. Imposing such

2

a new hurdle for provisional arrests is not only unsupported in the caselaw but could also have far-reaching consequences on the ability of foreign governments to request the provisional arrest and detention of fugitives who are in active flight or who pose an imminent danger to the community.

Even if the Taylors' Motion were ripe, it is meritless.  The purported loophole through which the Taylors seek to evade justice simply does not exist.  As discussed above, Japan is not required to submit any additional information at this preliminary stage.  However, to resolve any doubts, Japan has voluntarily provided the government with a declaration from Public Prosecutor Naoki Watanabe, Tokyo District Public Prosecutors Office, which explains that the Taylors' alleged conduct constitutes a felony under Japanese law, that a Japanese court found probable cause to believe that the Taylors committed such a felony, and that Japan sought the Taylors' provisional arrests on the basis of that felony offense.  *See* Exhibit B ("Watanabe Declaration").  It is hornbook extradition law that a judicial officer must defer to a foreign government's interpretation of its own laws in conducting his narrow inquiry into whether a fugitive is extraditable.  This bedrock principle of international comity, articulated by the Supreme Court more than a century ago, has stood the test of time.  Indeed, the government is unaware of any case where a provisional arrest warrant was quashed based on a fugitive's opinion of foreign law that is contrary to the interpretation proffered by the foreign government.  Thus, while the Taylors seek to engage in debate about the appropriate probable cause standard governing provisional arrest requests, in this case the government has satisfied any probable cause standard for arrest and therefore the Court need not wade into that thicket.

The Court should deny the Motion in its entirety.

## **BACKGROUND**

## I.  **STATEMENT OF THE FACTS**

The Taylors are alleged to have orchestrated one of the most brazen escapes by a criminal defendant in recent memory.  The criminal defendant is Carlos Ghosn, the former CEO of Nissan who was indicted in Japan for committing serious financial crimes, including falsely reporting his income on Nissan's annual financial reports and shifting losses of his separate asset management company to Nissan.  The Complaints set forth the details of the Taylors' careful planning and execution of the escape plot.  *See* Complaints ¶7.  In summary, on December 28-29, 2019, the Taylors flew to Japan to carry out their mission of extracting Ghosn.  With military precision, they engineered a complex set of maneuvers that included the use of a private jet, multiple hotel rooms in different cities, a wardrobe change, bullet train travel, and two large black boxes.  Ultimately, Ghosn was concealed in one of the black boxes, loaded onto the private jet, and transported to Lebanon via Turkey.  As discussed above, Lebanon has no extradition treaty with Japan.  As such, Ghosn was able to thwart Japan's criminal process.  The Taylors, for their part, did not immediately return to the United States following Ghosn's escape.  Instead, they remained in Lebanon.  While the Taylors did eventually come home during the onset of the global pandemic, their stay was supposed to be fleeting, at least in the case of Peter Taylor. The Taylors were arrested on May 20, 2020, the same day Peter Taylor had a scheduled flight back to Lebanon.

According to Japan, its evidence against the Taylors includes video surveillance recordings, witness statements, meeting records, hotel records, and other proof indicating that the Taylors were behind Ghosn's escape.  It is therefore unsurprising that the Taylors' Motion is devoid of any argument that they are not the culprits.

## II. PROCEDURAL HISTORY

### A.  Proceedings in Japan

Judge Yukiko Yomori of the Tokyo District Court issued warrants for the Taylors' arrests on January 30, 2020, and those warrants were renewed by Judge Yomori on February 28, 2020, when the Taylors remained at large.  *See* Docket Nos. 17-1, 17-2; *see also* Watanabe Declaration ¶5.  The warrants append the Tokyo District Public Prosecutors Office's Request for an Arrest Warrant (the "Request for an Arrest Warrant").  *See* Docket Nos. 17-1 & 17-2 at 3-7.[3]  Following the issuance of the arrest warrants, Japan learned that the Taylors had returned to the United States from Dubai, United Arab Emirates, a country which has no extradition treaty with Japan or the United States.  Japan subsequently submitted requests to the United States for the Taylors' provisional arrests pursuant to Article IX of the Treaty.

### B.  Proceedings in the United States

In accordance with its obligations under the Treaty, on May 20, 2020, the United States filed Complaints seeking the Taylors' provisional arrests.  The Complaints averred, among other things, that a valid extradition treaty exists between the United States and Japan, which provides for the provisional arrest of fugitives with a view towards their extradition; that Japan had sought the Taylors' provisional arrests under that Treaty; that the Taylors had been accused in Japan with violating Article 103 of the Japanese Penal Code by enabling Ghosn's escape from Japan; and that a Japanese warrant for the Taylors' arrest remained outstanding.  *See* Complaints ¶¶ 2-6.  The Complaints also provided a detailed description of the alleged facts supporting Japan's provisional arrest requests.  *Id.* ¶7.

On May 6, 2020, this Court signed the Complaints and issued warrants for the Taylors' arrests.  U.S. law enforcement subsequently discovered that Peter Taylor had booked a flight from Boston to

---

[3] In this Opposition, pincites to all documents in the record (including the Motion) will refer to the ECF pagination.

Beirut, Lebanon—the same place to which Ghosn fled and which has no extradition treaty with Japan or the United States—departing on May 20, 2020. The morning of the scheduled flight, members of the U.S. Marshals Service arrested the Taylors at their home in Harvard, Massachusetts. The same day, the Taylors had their initial appearance before this Court, and the government filed a detention motion. The Taylors have been detained since their arrest and did not seek release until they filed the instant Motion on June 8, 2020. Pursuant to this Court's Order, the government has provided the Taylors with copies of the Japanese arrest warrants.[4]

Pursuant to Article IX of the Treaty, Japan has 45 days from the date of the Taylors' provisional arrests to submit its formal extradition requests through diplomatic channels. Once the undersigned Assistant U.S. Attorney obtains the formal extradition requests, following their receipt and review by the State Department, he will promptly file a copy with the Court and the Taylors will have full access to it. At that point, the government will move for an extradition hearing as soon as practicable. All this underscores the fact that the Taylors' Motion is not only premature and meritless, but also unnecessary and duplicative of the extradition hearing which may be held shortly.

## III. LEGAL BACKGROUND

Extradition is a means by which a fugitive is returned to a foreign country, typically pursuant to a treaty, to face criminal charges or to serve a sentence of imprisonment.[5] In the United States, it is

---

[4] Contrary to the Taylors' claim, they did not seek any discovery from the government until June 2, 2020. On that date, the government informed the Taylors that they would receive a copy of Japan's formal extradition request at the appropriate time but that the applicable caselaw did not support their additional demand for information provided by Japan to the United States in connection with the provisional arrest. The Taylors immediately filed a motion to compel discovery from the government. Docket No. 12. On June 4, 2020, the Court ordered the government to provide any charging document showing that the Taylors have been charged with a violation of Article 103 of the Japanese Penal Code, as well as any accompanying Japanese warrant, but otherwise denied the broader discovery sought by the Taylors. Docket No. 13. The government complied with the Court's June 4, 2020, Order on the same day.

[5] A more detailed background on extraditions is provided in the government's detention memo, which the government incorporates fully herein. *See* Docket No. 9.

primarily an executive function, with a limited role carved out for the judiciary pursuant to the federal extradition statute.  *See* 18 U.S.C. § 3184.  Pursuant to 18 U.S.C. § 3184, the judicial officer's inquiry is confined to whether (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crime for which extradition is requested is covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to the offense for which extradition is sought.  *See, e.g.*, *In re Extradition of Howard*, 996 F.2d 1320, 1324 n.1 (1st Cir. 1993).  If the judicial officer finds these elements have been established, he "'shall certify' to the Secretary of State that a warrant for the surrender of the relator 'may issue.'"  *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997) (quoting 18 U.S.C. § 3184).  After a fugitive is certified as extraditable, the Secretary of State, and not the judicial officer, decides whether the fugitive will be surrendered to the requesting country.  *See* 18 U.S.C. §§ 3184, 3186; *Kin-Hong*, 110 F.3d at 110.

Extradition proceedings are not criminal proceedings and entail no determination of the guilt or innocence of the fugitive.  *Koskotas v. Roche*, 931 F.2d 169, 177 (1st Cir. 1991); *In the Matter of the Extradition of Hilton*, No. 13-7043, 2013 WL 1891327, at *3 (D. Mass. May 3, 2013) ("An extradition proceeding is not an ordinary Article III case or controversy and it is not a criminal proceeding.").  Further, "[b]y design, 'the procedural framework of international extradition gives to the demanding country advantages most uncommon to ordinary civil and criminal litigation.'"  *Skaftouros v. United States*, 667 F.3d 144, 155 (2d Cir. 2011) (quoting *First Nat'l City Bank v. Aristeguieta*, 287 F.2d 219, 226 (2d Cir. 1960)); *see also Hilton*, 2013 WL 1891327, at *3 ("Given the limited purpose of extradition hearings, the individual whose extradition is requested . . . does not benefit from most of the protections traditionally afforded to defendants in criminal proceedings.").

Most extradition treaties, including the Treaty at issue here, include a provision authorizing the provisional arrest of a fugitive prior to the requesting country's submission of its formal extradition request. Treaty, Art. IX. "The purpose of provisional detention is to allow for the expeditious capture of fugitives when the demanding country has not yet gathered the documentation necessary for extradition." *In re Extradition of Skaftouros*, 643 F. Supp. 2d 535, 546 n.7 (S.D.N.Y. 2009).

## ARGUMENT

The Taylors should remain detained because they have not carried their heavy burden to show by clear and convincing evidence that they are not flight risks and that special circumstances warrant their release. Moreover, the Taylors' Motion to Quash the arrest warrants should be denied because the warrants were properly issued by the Court, and in any event, the proper time for the Taylors to present their challenge to probable cause is at their extradition hearing, not through their Motion.

## I.   THE TAYLORS SHOULD REMAIN DETAINED BECAUSE THEY ARE A FLIGHT RISK AND NO SPECIAL CIRCUMSTANCES WARRANT THEIR RELEASE

As this Court has previously recognized, bail in international extradition cases "is appropriate only where the defendant's circumstances are extraordinary and will subject the defendant to difficulties beyond those applicable to all defendants facing extradition." *In the Matter of the Extradition of Drumm*, 150 F. Supp. 3d 92, 96 (D. Mass. 2015) (Cabell, M.J.); *see also, e.g.*, *United States v. Kin-Kong*, 83 F.3d 523, 524 (1st Cir. 1996) (bail in international extradition cases is "limited to situations in which the justification [for release] is pressing as well as plain") (internal quotation marks and citation omitted). "[T]he burden is on the defendant to prove *both*: 1) that he is neither a flight risk, nor a danger to the community; *and* 2) that there are special circumstances [that] justify release on bail." *Drumm*, 150 F. Supp. 3d at 96 (internal quotation marks and citation omitted) (emphasis added). The fugitive must meet this burden with clear and convincing evidence. *See, e.g.*, *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 55 (D. Mass. 2010) (citation omitted). The Taylors have not met this heavy burden.

**A. The Taylors should remain detained because they present a clear risk of flight.**

**1. The Taylors' facilitation of Ghosn's escape demonstrates their aptitude for evading law enforcement and disregard for bond conditions.**

While most fugitives in international extradition cases have an incentive to flee, here the Taylors also have the distinct quality of being experts in the subject of escape. They stand accused in Japan of engaging in a high-risk and complex operation to smuggle Ghosn out of that country in violation of his bail conditions. In their Motion, the Taylors do not deny their involvement in Ghosn's flight from prosecution, which evidences their blatant disrespect for the law in general and bail conditions in particular. Moreover, Michael Taylor himself concedes that he has "special and unique skills" related to the extraction of individuals from foreign countries, as well as conducting complex undercover operations involving organized crime and international drug trafficking (Motion at 32). The Taylors essentially ask this Court to trust them that they would not deploy their tradecraft to escape now that their own liberty is at stake. The strong presumption against bail in international extradition cases does not permit such a leap of faith.

**2. The Taylors concede they have strong ties to Middle Eastern countries that have no extradition treaty with Japan or the United States.**

The Taylors readily admit to their deep ties with countries in the Middle East that lack extradition treaties with the United States or Japan (Motion at 32-39). Indeed, Michael Taylor touts his "knowledge of and connections in the Middle East." *Id.* at 32 n.14. Peter Taylor's connections are also extensive, as he admits to having "spent the majority of the past 15 months residing with his older brother in Lebanon." *Id.* at 35-36. In addition, Peter Taylor has "engaged in business travel primarily to the United Arab Emirates," *id.* at 36, which is another country without an extradition treaty with Japan or the United States. These strong overseas connections, combined with their expertise in hatching escape plots, make the Taylors exceptional flight risks.

### 3.   Michael Taylor is a convicted felon who was previously found to be a flight risk and danger to the community.

Michael Taylor is a convicted felon who pled guilty to honest services wire fraud based on his participation in a bribery scheme in which he agreed to give a 24-year veteran of the FBI money, a job, and equity in multimillion dollar contracts in exchange for that FBI agent impeding a grand jury investigation into Michael Taylor. *See United States v. Michael L. Taylor*, 2:12-cr-645 (D. Utah), Doc Nos. 536, 1011. Here is an excerpt from the government's sentencing memorandum:

> When Taylor's indictment in Utah was imminent, he emailed Lustyik on August 15, 2012, to let Lustyik know the Criminal Chief in the U.S. Attorney's Office in the District of Utah told Taylor's attorney the indictment was going to happen.  Taylor further told Lustyik, "[u]nless someone tells him to stop."  Lustyik replied, "I'm on it."

*See* Docket No. 1011 at 13-14.[6]

Critically, following his arrest in that case, Michael Taylor was ordered detained based on a finding that he was a flight risk and a danger to the community, and that decision was upheld on appeal to the Tenth Circuit. *See United States v. Taylor*, Case Nos. 12-4186 & 12-4187, 2013 WL 2466627 (10th Cir. June 10, 2013).  Specifically, the Tenth Circuit concluded that "[t]he government offered ample evidence that Mr. Taylor presents a flight risk," that "[t]he government presented evidence of the extent to which Mr. Taylor was willing to go to derail the investigation and prosecution of the first indictment against him," and that "further attempts to obstruct justice cannot be assured by conditions of release." *Id.* at *1.

The district court elaborated on Michael Taylor's flight risk in a subsequent decision which denied another effort by Michael Taylor to be released on bond:  "The Government points out that Mr.

---

[6] In his Motion, Michael Taylor declines to accept responsibility for the criminal conduct that led to his conviction (Motion at 33-34).  If Mr. Taylor had made similar assertions at his plea hearing, it is unlikely the court would have accepted the plea or the signed agreements.

Taylor, who is fluent in Arabic, has traveled extensively in other countries, particularly those in North Africa and the Middle East.  He is a permanent resident of Lebanon. His wife is a Lebanese citizen and one of his sons attends school in Lebanon.  He has a home in Lebanon.  And the United States does not have an extradition treaty with Lebanon." *United States v. Michael Taylor*, 12-cr-00502, Docket No. 351 at 11 (D. Utah Aug. 22, 2013) (Attached hereto as Exhibit C).  With respect to his skills of evasion, the court found that "in addition to Mr. Taylor's extensive travel in and familiarity with foreign countries, he has the knowledge, skills, and access to resources that would be highly useful to him in an effort to leave the United States if he so chooses." *Id.* at 12.  Moreover, "Mr. Taylor's business website touts its airport security system expertise including 'the latest electronic detection and surveillance systems' and describes the vulnerability of ports, while bragging about its ability to secure ports." *Id.* at 13.

In an effort to secure his release in that case, Michael Taylor offered the following conditions: Surrender of his and his family's passports, GPS monitoring, restricted travel to Massachusetts and Utah, forfeit of $5.2 million seized by the government, his father's house as collateral, and waiver of extradition. *Id.* at 14-15.  Finding the surrender of passports inadequate, the court reasoned that Michael Taylor had "access to elite security professionals, experience bribing foreign nationals, and knowledge of entry and exit point security system vulnerabilities, [which] render[ed] traditional bail provisions such as surrendering one's passport ineffective." *Id.* at 13.  Finding a GPS monitoring bracelet insufficient, the court ruled that "[g]iven Mr. Taylor's planning skills, experience with clandestine operations, the ease with which he travels internationally, likely access to funds necessary to travel, and a reported willingness to bribe officials, his ability to evade law enforcement (whether he leaves the country through special channels or not) is substantial." *Id.* at 14.  Given Michael Taylor's financial resources,

11

the court found that the other conditions were also insufficient to reasonably assure his appearance. *Id.* at 15.

The fact that Michael Taylor was found to be a flight risk and danger to the community in a domestic criminal case strongly weighs in favor of detention here, particularly given the considerably more exacting standards for release in international extradition proceedings.

### 4. The Taylors have the resources to flee.

As noted above, the presiding judge in Michael Taylor's criminal case found that he likely had access to the means to flee. Here too, the Taylors could draw on their own resources, Ghosn's vast wealth, and/or the wealth of another one of their clients or associates, to finance their escape and relocation overseas. This is particularly true if the Taylors fled to Lebanon, where they already have a family residence and where Ghosn now resides. These facts weigh in favor of detention. *See, e.g.*, *United States v. Acherman*, No. 15-10046, 2015 WL 4576926, at *1 (D. Mass. July 30, 2015) (affirming order of detention and finding that a $1.7 million bond, surrender of passport, and home monitoring were insufficient conditions to guarantee defendant's appearance in a U.S. criminal case due to defendant's "ties to foreign countries and access to cash").

### 5. The Taylors' arguments are insufficient to overcome the facts evidencing their exceptional flight risk.

None of the Taylors' arguments overcome the facts demonstrating their clear risk of flight. While the Taylors claim they voluntarily returned to the United States despite their knowledge of the Japanese arrest warrants (Motion at 9), they simply may have "felt safe enough being thousands of miles away from the government that was seeking to prosecute [them]." *Man-Seok Choe v. Torres*, 525 F.3d 733, 741 (9th Cir. 2008). The global pandemic could also have played a part in their calculus. Regardless, now that the prospect of their extradition is not just theoretical, they have every incentive to flee. And while Michael Taylor asks this Court to trust that he would only deploy his specialized skills in hatching

escape plots for the public good, his criminal past suggests otherwise.  The Taylors' other arguments are similarly meritless.

- The Taylors cite the Bail Reform Act and note that their offenses did not involve violence or drugs.  But the Bail Reform Act does not apply to international extradition proceedings, as this Court and myriad others have found.  *See, e.g.*, *Drumm*, 150 F. Supp. 3d at 96 (collecting cases).

- The Taylors claim they lack an incentive to flee because the maximum punishment for their crimes is only three years and they have a winning defense.  Yet, they have hired a veritable army of lawyers in an effort to avoid extradition and avoid defending themselves in Japan.

- The Taylors note their ties to the Harvard, Massachusetts community.  However, as discussed above, they also have strong family and business connections to countries in the Middle East that have no extradition treaty with Japan.  *See United States v. Yassine*, 574 F. App'x 455, 460 (5th Cir. 2014) (affirming the district court's detention order, finding that the defendant "(1) was a world traveler, at home in many countries, and fluent in multiple languages; [and] (2) had family in Lebanon (a country with which there is no extradition agreement)").  It also bears noting that the Taylors willingly put their family commitments—which they cite as a justification for their release—in jeopardy by allegedly participating in Ghosn's escape.

- Contrary to the Taylors' claims, there is no foolproof way to ensure they do not flee, particularly given their expertise in the subject.  *See, e.g.*, *Risner v. Fowler*, No. 3:19-CV-03078, 2020 WL 2110579, at *4 (N.D. Tex. May 1, 2020) ("GPS monitoring would not alleviate the flight risk.  An ankle monitor—even assuming one were available—can be removed."); *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001) (affirming detention order and holding that home confinement arrangements are "never one hundred percent infallible, and the presumption against bail in extradition cases counsels against incurring even a small risk absent special circumstances").

The Taylors have failed to demonstrate by clear and convincing evidence that they are not flight risks.  The inquiry can and should end here.  *See, e.g.*, *In the Matter of the Extradition of Martinelli*, 263 F. Supp. 3d 1280, 1304 (S.D. Fla. 2017) (the fugitive "poses such a risk of flight that bail should not be contemplated for an extradition proceeding notwithstanding the special circumstance involved in the extradition of a former head of state").

13

**B.  There are no special circumstances warranting the Taylors' release.**

Even if the Court found that the Taylors are not flight risks, they still must be detained because no special circumstances warrant their release.  *See, e.g., Kin–Hong*, 83 F.3d at 524 (reversing district court's order granting release where defendant failed to show special circumstances justifying release); *United States v. Leitner*, 784 F.2d 159, 161 (2d Cir. 1986) ("Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance.).

### 1.  The Taylors have not established a high likelihood of success on the merits of their claims, even if this factor were considered a special circumstance.

The government agrees with courts that have held the likelihood of success "does not qualify as a special circumstance in foreign extradition cases." *In the Matter of the Extradition of Lui*, 913 F. Supp. 50, 55 (D. Mass. 1996); *see also, e.g., United States v. Risner*, No. 3:18-MJ-765-BN, 2018 WL 6809796, at *12 (N.D. Tex. Dec. 27, 2018) ("Contrary to Risner's assertion, most courts hold that arguments regarding the substantive merits of an extradition request are properly raised at the fugitive's extradition hearing and are immaterial to his prior bail determination.") (collecting cases).  While other courts have found that such a factor can theoretically constitute a special circumstance, prejudging the outcome of the extradition proceedings before Japan has even formally requested the Taylors' extradition is not appropriate.  *See, e.g., Kin-Hong*, 83 F.3d at 525 (reversing the district court's order of release, rejecting the fugitive's argument that his likelihood of success constituted a special circumstance, and finding "[t]he factual record will be further developed at the extradition hearing and it is premature for this court to consider the merits of [the fugitive's] claims"); *Castaneda-Castillo*, 739 F. Supp. 2d at 62 ("At this juncture, it is premature to determine if Castaneda–Castillo is likely to prevail on his probable cause challenge.").[7]  In any event, as discussed *infra*, the Taylors have not made any showing of success on the

---

[7] The Taylors concede that the cases where bail was granted based on this factor involved evidentiary or other deficiencies that did not involve the fugitive contesting the foreign government's interpretation of its own substantive laws. (Motion at

14

merits, let alone a strong one, and they should not be released based on this purported special circumstance.

### 2. The Taylors' claims regarding purported Lebanese proceedings do not constitute a special circumstance.

The Taylors claim that they have been "acquitted" in Lebanon and this fact constitutes a special circumstance warranting their release (Motion at 29). Not surprisingly, the Taylors fail to cite any caselaw supporting this errant proposition. Indeed, any Lebanese proceedings have no bearing on the extradition hearing, much less do they overcome the strong presumption against bail. Under Article IV, Section 2 of the Treaty, the United States "*may* refuse extradition when the person sought has been tried and acquitted . . . in a third State for the offense for which extradition is requested." *See* Treaty, Art. IV, Section 2 (emphasis added). This permissive grounds to refuse extradition if there has been an actual trial and acquittal for the same offense, falls exclusively within the domain of the Secretary of State to consider. The judicial officer presiding over an extradition hearing, by contrast, "has no discretionary decision to make." *Vo v. Benov,* 447 F.3d 1235, 1247 (9th Cir. 2006) (citation omitted); *see also, e.g., Patterson v. Wagner*, 785 F.3d 1277, 1281 (9th Cir. 2015) (Secretary of State decides issues for which "there is no mandatory duty that a court may enforce."). In any event, the Taylors have not shown that they were actually "tried and acquitted" in Lebanon for violating Article 103 of the Japanese Penal Code, which is the offense for which Japan sought their provisional arrests.[8]

---

22). In *In re Santos*, the court ruled, after Mexico submitted its formal request, that the fugitive should be released on bail because Mexican courts had invalidated Mexico's own arrest warrant. 473 F. Supp. 2d 1030 (C.D. Cal. 2006). In *United States v. Ramnath*, where the defendant was the mother of two minor children and had no brother Peter." *See* Motion at decided to grant bail even after finding that the government would "easily" satisfy probable cause at the extradition hearing. 533 F. Supp. 2d 662, 680, 688 (E.D. Tex. 2008). The other cases cited by the Taylors are similarly off the mark because they involved inapposite facts and circumstances.

[8] According to the Taylors' Lebanese lawyer, Michael Taylor's eldest son filed a petition with the Lebanese prosecutor's office on February 17, 2020, "in order to prove the innocence of his father Michael and his brother Peter." *See* Motion at Exhibit K. That same day, the eldest son met with the prosecutor and the prosecutor decided to "close the case." *Id.* The translated documents state that this was "a decision to close the investigation," not a trial and acquittal on the offense alleged by Japan. Notably, while the Taylors express concern about offending Lebanon, they show no similar restraint in asking

### 3. The Taylors' family circumstances do not warrant their release.

The government does not dispute that finding appropriate care for Michael Taylor's aging adoptive stepfather may be more challenging while Michael Taylor is detained (Motion at 37-38). However, this is not a special circumstance sufficient to overcome the strong presumption against bail. *See, e.g., Lo Duca v. United States*, No. 95-cv-713, 1995 WL 428636, at *15, 16 (E.D.N.Y. July 7, 1995), *aff'd sub nom. Lo Duca v. United States*, 93 F.3d 1100 (2d Cir. 1996) (denying bail in extradition case despite the fugitive's role as the primary caretaker for his wife with advanced Alzheimer's dementia and noting that "[a] review of the case law has failed to uncover any case in which the poor health of a member of the relator's family has been held to be a special circumstance sufficient to warrant the granting of bail") (collecting cases).  Moreover, Michael Taylor concedes that his stepfather is being cared for by his middle son, as well as by neighbors.  The mitigated hardship is not a special circumstance.  *See, e.g., id.* ("Mrs. Lo Duca's condition is not a justification which is 'pressing as well as plain' as she is being adequately cared for by her son, other members of the family, and a housekeeper."); *see also, e.g., Drumm*, 150 F. Supp. 3d at 99 ("the fact that the defendant's family depends on him for financial and emotional support is not a special circumstance weighing in favor of release"); *United States v. Snyder*, No. 13-7082, 2013 WL 1364275, at *7 (April 3, 2013) (fugitive's care for stepdaughter determined not to be a special circumstance).[9]

---

this Court to effectively override a Japanese court's probable cause determination regarding the Taylors' alleged commission of a Japanese offense that took place in Japan.

[9] While the Taylors claim the extradition proceedings could take months, the government is prepared to proceed expeditiously and the First Circuit has rejected the notion that the "normal passage of time inherent in the litigation process constitutes a 'special circumstance.'"  *Kin-Hong*, 83 F.3d at 525.

**4.  COVID-19 is not a basis for the Taylors' release.**

**a.  COVID-19 is not a special circumstance unique to the Taylors.**

According to the Motion, the "ongoing COVID-19 situation makes it unwise to detain the Taylors (who have both travelled internationally in the past several months) in close proximity to others" (Motion at 23-24).  However, it has been well over 14 days since the Taylors were last overseas and it would add insult to injury if they were released based on the foreign travel during which they allegedly committed the very offense for which Japan sought their provisional arrests.

Peter Taylor is 27 years old and has not alleged any unique vulnerability to COVID-19.  *See Risner*, 2020 WL 2110579, at *7 (fugitive's "general concern that he may contract COVID-19 while incarcerated, while understandable, does not warrant release."); *Valentino v. United States Marshal*, No. 4:20-cv-304, 2020 WL 1950765, at *2 (S.D. Tex. Apr. 15, 2020) (the fugitive's "general arguments based on the pandemic, without any specific identified risks to him, do not suffice as a 'special circumstance'"); *c.f. e.g.*, *United States v. Mackenzie*, 13-10149, 2020 WL 2104786, at *3 (D. Mass. May 1, 2020) (denying compassionate release to criminal defendant who had failed "to show that he is materially more at risk for a serious medical condition due to the COVID-19 pandemic than the general prison population"); *United States v. Diaz*, 20-cr-10035, 2020 WL 1974257, at *1 (D. Mass. Apr. 23, 2020) ("Defendant's generalized and systemic concern regarding the virulent pandemic is insufficient to demonstrate entitlement to revocation of the pretrial detention order issued by the Magistrate Judge.").

While Michael Taylor notes a prior surgery on his lung, this does not overcome the strong presumption of detention in this international extradition proceeding.  In *Valentino*, for example, the court rejected the fugitive's bid for release based on COVID-19 even though the fugitive was 73 years old and had hypertension.  2020 WL 1950765, at *1.  Similarly, in *Risner*, the court found that COVID-19 was not a special circumstance warranting release even though the fugitive was 76 years old and had

a litany of health issues which he claimed put him at higher risk under the current circumstances.  2020 WL 2110579, at *4-5.  Moreover, myriad courts in this District and elsewhere have denied release to U.S. criminal defendants based on COVID-19, even where such defendants had underlying health issues and the more liberal standards of the Bail Reform Act applied.[10]

**b. The Taylors have not shown that Norfolk's precautions have been inadequate.**

Given the state of the worldwide pandemic, administrators, staff, and correctional officers at Norfolk County Correctional Facility ("Norfolk"), where the Taylors are currently detained, have responded aggressively with measures to mitigate the spread of the virus within the facility and to treat inmates who fall ill.  Danielle Boomhower, Assistant Deputy Superintendent in the Norfolk County Sheriff's Office, who oversees the facility and housing operations at Norfolk, has provided an affidavit describing the facility's efforts ("Boomhower Affidavit," attached hereto as Exhibit D).  These measures include:

- Adopting enhanced inmate intake procedures, including scrutiny of travel and exposure to illness, and a 14-day quarantine upon admission to the facility;
- Adopting treatment and detection practices consistent with guidelines issued by the Center for Disease Control ("CDC") and the Department of Public Health ("DPH");
- Suspending family and friend visits;
- Restricting attorney visits to non-contact, behind glass visits, and instituting mandatory temperature checks for all attorneys entering the non-contact visiting area;
- Restricting non-security and non-essential staff from entering the facility;
- Requiring all staff to wear masks and submit to regular temperature checks;
- Requiring all inmates to wear masks;
- Arranging for court hearings to be conducted by videoconference and telephone to limit inmate travel outside of the facility and resulting possible exposure;
- Maintaining an aggressive (3 times daily) cleaning schedule for the housing units; and

---

[10] *See, e.g., United States v. Perez*, 15-10256, 2020 WL 1991161, at *4 (D. Mass. Apr. 22, 2020)  ("While I am sympathetic to the valid health concerns of an asthmatic during the pandemic, I do not find that the pandemic and the risks it poses for Perez change the detention decision."); *United States v. Guzman*, 15-cr-10338, 2020 WL 1974332, at *3 (D. Mass. Apr. 24, 2020) ("[D]efendant has not shown that his specific medical conditions and prison conditions create such a high risk of serious illness that it would qualify as an 'exceptional reason' for release."); *United States v. Oladimu*, 1:01-cr-10198, 2020 WL 1866253, at *2 (D. Mass. Apr. 14, 2020) (denying release to defendant with high blood pressure); *Boyer v. United States*, 14-cr-10163, 2020 WL 1978190, at *2 (D. Mass. Apr. 24, 2020) (same).

- Educating staff and inmates on proper social distancing and sanitation practices.

Boomhower Aff. at ¶3.  Boomhower also advised that Norfolk is currently below maximum capacity which has afforded the facility flexibility in making housing assignments and allowed for greater social distancing between inmates.  *Id.* at ¶4.  She also noted that the medical staff, including an infectious disease specialist, are equipped to treat inmates who have medical conditions that are associated with increased risk of complications from COVID-19.  *Id.* at ¶¶5, 19.

As the Taylors note, there have been recent positive tests among certain inmates at the Norfolk facility, although the Taylors were not assigned to the units housing the inmates who have tested positive.  *Id.* at ¶20.  Boomhower has described Norfolk's robust response to the recent positive tests.  After learning that an inmate tested positive on May 26, 2020, the facility tested all the inmates in that housing unit and quarantined them pending the results.  *Id.* at ¶¶10-11.  Staff continued to clean and sanitize the unit.  *Id.* at ¶11.  On June 4, 2020, four inmates from that unit, who had previously tested negative, were retested.  Two inmates tested positive and will remain on isolation status.  *Id.* at ¶13.  On the advice of the infectious disease physician, all inmates in that housing unit were retested and 17 inmates tested positive.  *Id.* at ¶15.  Norfolk staff continue to hold the unit in isolation and medical staff enter four times per day to take temperatures and oxygen levels, distribute medication, and collect sick call slips for the inmates in the unit.  *Id.*  Staff took similar measures after a June 10, 2020 positive test in another housing unit.  *Id.* at ¶¶16-17.  If any inmate needs medical assistance beyond Norfolk's capabilities, they are transported to a hospital.  *Id.* at ¶15.  In short, in incredibly difficult circumstances, the staff, administrators, and correctional officers at Norfolk have undertaken aggressive steps, in consultation with a staff infectious disease specialist, to limit the virus's spread in the facility.

The Taylors have not met their burden to show by clear and convincing evidence that COVID-19 is a special circumstance that is unique to them as opposed to the general prison population.

19

### 5. The Taylors have not created a special circumstance by combining their claims that individually are not special circumstances.

Much like in *Drumm*, all of these factors claimed by the Taylors even "considered together still do not constitute a special circumstance." 150 F. Supp. 3d at 100. It is the Taylors' burden to prove the existence of a special circumstance by clear and convincing evidence and they have not done so. Regardless, even if this Court found that a special circumstance existed, the Taylors present an unacceptable risk of flight and should be detained on that basis alone. For all these reasons, the Taylors' Motion for Release should be denied.

## II. THE COURT PROPERLY ISSUED THE ARREST WARRANTS AND THE TAYLORS' MOTION TO QUASH THEM SHOULD BE DENIED

### A. The Court did not err in issuing the arrest warrants based on the government's sworn and detailed Complaints.

The government's sworn and detailed Complaints amply support the Court's issuance of the arrest warrants. The Complaints aver that Japan requested the Taylors' provisional arrests under Article IX of the Treaty, which is in force between the United States and Japan. *See* Complaints ¶¶2-4. The Complaints also identify Article 103 of the Japanese Penal Code as one of the statutes which Japan alleges the Taylors violated. *Id.* at ¶5. The Complaints further explain that the Taylors are alleged to have violated Article 103 by enabling Ghosn's escape. *Id.* In addition, the Complaints confirm that Japanese warrants for the Taylors' arrests remain outstanding. *Id.* at ¶6. Then, in exacting detail, the Complaints describe the alleged facts supporting the alleged offense. *Id.* at ¶7.

The information provided in the sworn Complaints satisfy the requirements of the extradition statute for the issuance of an arrest warrant. *See* 18 U.S.C § 3184. Section 3184 provides that an authorized judicial officer "may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by [an extradition treaty between the United States and the foreign government]

20

. . . issue his warrant for the apprehension of the person so charged." *Id.*[11] The First Circuit has adhered to the plain language of the statute in articulating the standard for the issuance of an arrest warrant in the extradition context. *See Kin-Hong*, 110 F.3d at 109 ("[T]he judicial officer, upon complaint, issues an arrest warrant for an individual sought for extradition, provided that there is an extradition treaty between the United States and the relevant foreign government and that the crime charged is covered by the treaty.").

In their Motion, the Taylors have not disputed that: (1) the Court is authorized to issue provisional arrest warrants;[12] (2) the Court has personal jurisdiction over them;[13] (3) there is an extradition treaty in force between Japan and the United States; (4) the Complaints were made under oath; and (5) the Complaint alleges the Taylors stand accused in Japan with committing an offense—Article 103 of the Japanese Penal Code—which is a felony offense and therefore falls within the scope of the Treaty.[14] Accordingly, the Complaints satisfy the requirements of the extradition statute for the issuance of an arrest warrant. The analysis can and should end here, within the four corners of the Complaints.

---

[11] The extradition statute does not differentiate between warrants issued pursuant to provisional arrest requests and warrants issued pursuant to formal extradition requests.

[12] The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. Both magistrate judges and district judges may render a certification under Section 3184. *See, e.g.*, *Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also* Rules for United States Magistrates Judges in the United States District Court for the District of Massachusetts, Rule 1(e) ("Each United States Magistrate Judge appointed by this court is authorized to . . . [c]onduct extradition proceedings, in accordance with 18 U.S.C. Section 3184.").

[13] The Taylors were found and arrested in Harvard, Massachusetts.

[14] In order to fall within the scope of the Treaty, the offense must be punishable by more than one year in prison. *See* Treaty, Art. II. The Taylors do not dispute that Article 103 carries a term of imprisonment of up to three years. *See* Motion at 18; *see also* Watanabe Declaration at ¶8.

21

**B.  The Taylors' claims are premature and meritless.**

    **1.  The Taylors will have ample opportunity to assert their defenses at the extradition hearing.**

In seeking to quash the arrest warrants, the Taylors stray far from the Complaints, and instead rely on erroneous factual claims and errant assertions regarding Japanese law, as well as extraneous exhibits, including an INTERPOL notice, a Japanese decision on Ghosn's bail application, newspaper articles, and declarations from their Japanese and Lebanese attorneys.  *See* Docket No. 17-1 through 17-11.  In the Taylors' view, this Court should quash the arrest warrants based on their one-sided account of the law and facts, and before Japan has even had the opportunity to present its evidence through the submission of its formal extradition request.  However, the extradition statute and caselaw does not support such an attempt to short-circuit the extradition hearing.

Under Section 3184, the issue of whether the "evidence [is] sufficient to sustain the charge under the provisions of the proper treaty" is not considered until the extradition hearing.  *See* 18 U.S.C § 3184.  The First Circuit and courts around the country have adhered to the terms of the statute in the face of similarly premature claims.  *See, e.g., Kin- Hong*, 83 F.3d at 525 ("The factual record will be further developed at the extradition hearing and it is premature for this court to consider the merits of [the fugitive's] claims."); *Skaftouros*, 643 F. Supp. 2d at 546 (provisional detention does not require "wading into foreign criminal procedure"); *In the Matter of the Extradition of Koskotas*, 88–MJ-73, 127 F.R.D. 13, 25 (D. Mass. July 13, 1989) ("[T]his Court finds that such claims are premature because sufficiency and weight of the evidence are issues to be resolved at the extradition hearing and not on a motion to dismiss."); *In re Extradition of Gohir*, No. 2:14-MJ-00314-CWH, 2014 WL 2123402, at *8 (D. Nev. May 21, 2014) ("The requirements for provisional arrest should not be confused or conflated with the requirements for the actual extradition request or hearing.").

Requiring a judicial officer to reach conclusions of foreign law in the context of a provisional arrest request would be antithetical to the purpose of provisional arrest requests, which is "to allow for the expeditious capture of fugitives when the demanding country has not yet gathered the documentation necessary for extradition." *Skaftouros*, 643 F. Supp. 2d at 546 n.7.  Indeed, erecting such a new hurdle would in many cases render provisional arrest impossible, leaving the United States unable to comply with its treaty obligations and allowing foreign fugitives who may be in active flight or who present an imminent danger to the community to evade apprehension.  The consequences would be grave, posing risks to the United States' international stature and credibility, and jeopardizing its ability to obtain the provisional arrests of its own fugitives located overseas.

The fact that the deadline for Japan to submit its formal request through diplomatic channels is less than three weeks away underscores the premature nature of the Taylors' Motion.  In fact, once Japan submits its formal request, the Taylors' Motion will become moot.  *See, e.g.*, *Martinez v. United States*, 828 F.3d 451, 470 (6th Cir. 2016) (*en banc*) ("Cruz Martinez's provisional arrest ended when Mexico submitted its formal extradition request, which means, as the panel majority correctly concluded, that his challenges to that arrest are moot."); *In Matter of Extradition of Pineda Lara,* Case No. 97–Cr.–Misc.–1, 1998 WL 67656, at *11 n.10 (S.D.N.Y. Feb. 18, 1998) ("Any issue regarding the validity of the provisional arrest has been rendered moot by the Czech Republic's subsequent formal request for extradition and the accompanying supporting documents."); *United States v. Tang Yee–Chun*, 657 F. Supp. 1270, 1271 n.1 (S.D.N.Y. 1987) ("[T]he United Kingdom's subsequent formal request for extradition has rendered moot the question of the validity of the provisional arrests."); *cf. Caltagirone v. Grant,* 629 F.2d 739, 750 (2d Cir. 1980) (fugitive's challenge to provisional arrest not moot where court found, based on facts and circumstances of the case, that the government would likely seek the fugitive's

provisional arrest a second time if initial attempt at extradition was unsuccessful). Accordingly, the Court should find the Taylors' claims are premature and deny their Motion.

### 2. Regardless, the Taylors' defenses are meritless.

#### a. The Court must defer to Japan on issues of pure Japanese law.

Even if the Taylors' claims were ripe for review, which they are not, they are meritless and should be rejected for the reasons stated herein. Japan has confirmed that a Japanese court found probable cause to believe that the Taylors committed violations of Article 103, that the same court issued arrest warrants for that felony offense, and that Japan sought the Taylors' provisional arrests on that basis. *See* Watanabe Declaration at ¶5. Japan has also provided a thorough explanation of the applicability of Article 103 to the Taylors' conduct. *Id.* at ¶¶8-12. The Court's inquiry can and should end here. It is hornbook extradition law that a judicial officer must defer to a foreign government's interpretation of its own laws in conducting his narrow inquiry into whether a fugitive is extraditable.

As the Supreme Court stated well over a century ago, "[i]t can hardly be expected of us that we should become conversant with the criminal laws of [the country seeking extradition], or with the forms of warrants of arrest used for the apprehension of criminals." *Grin v. Shine*, 187 U.S. 181, 190 (1902). Since *Grin*, courts have repeatedly rejected attempts by fugitives to defeat extradition based on claims regarding the foreign country's criminal laws and procedures. *See, e.g.*, *Noeller v. Wojdylo*, 922 F.3d 797, 806 (7th Cir. 2019) ("United States courts hearing extradition requests have consistently expressed an unwillingness to interpret foreign law to invalidate arrest warrants."); *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("[W]e recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles.") (quoting *Emami v. United States Dist. Court*, 834 F.2d 1444, 1449 (9th Cir. 1987)); *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016) (refusing to "second-guess" Bosnian government's determination of what

constitutes an arrest warrant); *Melia v. United States*, 667 F.2d 300, 303 (2d Cir. 1981) ("We are . . . not expected to become experts in the laws of foreign nations.").[15]

The principle that a foreign country should not be required to prove to a U.S. court that it is properly construing its own laws is supported by general notions of international comity and "respect for the sovereignty of other nations." *In re Assarsson*, 635 F.2d 1237, 1244 (7th Cir. 1980). It is further supported by the prudential policy of avoiding the high risk that a U.S. court might erroneously interpret the law of a foreign country. *See id.* ("The possibility of error warns us to be even more cautious of expanding judicial power over extradition matters."). These interests are paramount in extradition proceedings, which the First Circuit has recognized "are grounded in principles of international comity," *Koskotas*, 931 F.2d at 174, and where the determination of the fugitive's ultimate guilt or innocence is reserved for the trier of fact in the foreign country. At bottom then, "American courts should treat foreign law the way American courts want foreign courts to treat American law: avoid determining foreign law whenever possible." *In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 466 F. Supp. 2d 1020, 1028 (N.D. Ill. 2006).

    b. **In any event, Japan has explained why the Taylors' claims are meritless and the Japanese arrest warrants confirm this fact.**

        i. **The Japanese arrest warrants include the felony offense for which Japan requested the Taylors' provisional arrests.**

Contrary to the Taylors' claims (Motion at 22-23), the Tokyo District Court issued arrest warrants for the Taylors for violations of Article 103 of the Japanese Penal Code. The very first sentence of the Request for an Arrest Warrant, which is appended to the Arrest Warrant, states as follows: "I

---

[15] *See, also e.g.*, *In re Extradition of Nezirovic*, No. 7:12-mc-39, 2013 WL 5202420, at *15 (W.D. Va. Sept. 16, 2013) ("It would be a grave insult for this court to presume to tell the Government of Bosnia and Herzegovina what is or is not legitimate under Bosnian law."); *In re Extradition of Schumann*, No. 18 CR 283, 2018 WL 4777562, at *4 (N.D. Ill. Oct. 3, 2018); *In re Extradition of Blasko*, No. 1:17-MC-00067, 2018 WL 6044921, at *28-31 (E.D. Cal. Nov. 19, 2018); *Schmeer v. Warden of Santa Rosa Cty. Jail*, No. 3:14-cv-285, 2014 WL 5430310, at *5-6 (N.D. Fla. Oct. 22, 2014).

hereby request issuance of an Arrest Warrant against the person specified below on the alleged *harboring of criminals* and accessoryship of violation of the Immigration Control and Refugee Recognition Act (Article 71, 25 II) case." *See* Docket Nos. 17-1 at 3, 17-2 at 3 (emphasis added).  As set forth in one of the Taylors' own exhibits, "harboring of criminals" is the title of Article 103 of the Japanese Penal Code, and that statute covers a person who "enables the escape of another person who has . . . committed a crime punishable with a fine or greater punishment . . . ." *See* Docket No. 17-10 at 3.  In case there was any doubt, the Request for an Arrest Warrant explains that the Taylors are alleged to have "enabled Ghosn's escape" in several ways.  *See* Docket Nos. 17-1 at 7, 17-2 at 7. Thus, as Japan confirms, "the request for the arrest warrant names the Penal Code offense—the Japanese word "犯人隠避" ("*han-nin-inpi*")[16]—which is covered by Article 103 . . . ."  Watanabe Declaration at ¶7.

Japan also confirms that its citation to the name of the offense covered by Article 103, rather than the numeric article of the Japanese Penal Code, is consistent with Japanese practice. *See id.* ("'Article 103' of the Penal Code was not written in the requests for arrest warrants or the arrest warrants because the applicable article can be identified based on the name of the offense.  By contrast, the applicable article of the Immigration and Refugee Recognition Act was included because without it, the offense violated would be unclear.").  Japan further confirms that the arrest warrants are based on the Taylors' alleged violation of two separate offenses: (1) a violation of Article 103 of the Japanese Penal Code and (2) a violation of Article 71, 25 II of the Immigration Control and Refugee Recognition Act.  *See id.* at ¶5 ("the Tokyo District Court's judge renewed arrest warrants for them for

---

[16] "The Japanese word '犯人隠避' ('*han-nin-inpi*') can be translated into 'harboring of criminals,' or more precisely, 'enabling the escape.'"  Watanabe Declaration at ¶7 & n.1.

violations of Article 103 *and* Immigration Control and Refugee Recognition Act (Article 71, 25 II)")

(emphasis added).[17]

In addition to errantly claiming that the arrest warrants do not allege a violation of Article 103, the Taylors baldly assert that "the United States seeks to extradite [them] based on an offense for which Japan did not seek extradition" (Motion at 21). The Taylors are mistaken. Japan specifically invoked Article 103 of the Japanese Penal Code as a basis for the Taylors' provisional arrest requests and that is the statute which the government cited in its Complaints. *See* Complaints ¶5; *see also* Watanabe Declaration at ¶5 ("Japan then submitted to the United States provisional arrest requests that relied on Article 103 of the Penal Code as the basis."). The Taylors have provided no basis to doubt the veracity of the Complaints sworn by the undersigned and confirmed by Japan. *See, e.g., United States v. Spatola*, No. 89-643-M (JLC), 1989 WL 62993, at *2 (E.D.N.Y. June 9, 1989) ("As the evidence submitted by the requesting party in an extradition request is deemed truthful for purposes of the probable cause determination, so too should the information presented for provisional arrest purposes be deemed truthful.") (citation omitted).

### ii. Article 103 covers the Taylors' alleged facilitation of Ghosn's escape.

The Taylors' brazen acts of entering the sovereign territory of Japan, hiding Ghosn in a box, and smuggling him out of the country so that he could avoid ongoing criminal proceedings fall squarely within the ambit of Article 103 of the Japanese Penal Code. In fact, Judge Yukiko Yomori of the Tokyo District Court found probable cause to believe that the Taylors committed such a felony offense. *See* Docket Nos. 17-1 at 2, 17-2 at 2 (arrest warrants issued by Judge Yomori); Watanabe Declaration at ¶5

---

[17] The Taylors attempt to merge the two separate offenses into one by claiming that the harboring and enabling escape language in the arrest warrants are part of the alleged immigration offense (Motion at 22). But this gloss is not supported by the arrest warrants' plain language and contradicts Prosecutor Watanabe's explanation of his own arrest warrant requests.

(noting probable cause standard for Japanese arrests).  The Taylors' contrary claims (Motion at 17-21) are meritless.[18]

The plain language of Article 103 demonstrates its clear applicability to the Taylors' conduct. Article 103 provides as follows:  "A person who harbors or enables the escape of another person who has either committed a crime punishable with a fine or greater punishment or has escaped from confinement shall be punished by imprisonment with work for not more than 3 years or a fine of not more than 300,000 yen."  *See* Watanabe Declaration at ¶8.  Here, the Taylors allegedly enabled the escape of another person (Ghosn) who was under indictment for crimes punishable with a fine or greater punishment.[19]  Accordingly, Article 103 plainly applies.  *Cf., e.g.*, *Jimenez* v. *Quarterman*, 555 U.S. 113, 118 (2009) ("It is well established that, when the statutory language is plain, we must enforce it according to its terms.").

The applicability of Article 103 to the Taylors' conduct is also supported by Japanese caselaw. Not only has the Japanese government brought charges under Article 103 in circumstances where the defendant enabled the escape of a person who was under indictment and not confined, but they have obtained a conviction.  *See* Watanabe Declaration at ¶12 (citing Judgment of Osaka District Court, May 10, 2000).  In the case cited by Japan, the defendant was convicted under Article 103 based on his enabling the escape of a person who had been indicted in Japan for violations of the Commercial Act and the Corporation Tax Act and who was not confined.  *Id.*  The defendant provided a credit card to

---

[18] The Taylors' arguments regarding Japanese law are principally derived from a declaration submitted by a law professor they have retained, Dr. William B. Cleary.  At the extradition hearing, the government reserves the right to challenge the admissibility of Dr. Cleary's declaration based on qualifications, relevance, authentication, or other grounds.  The same goes for all other exhibits submitted by the Taylors in support of their Motion.

[19] Japan confirms that Article 103 applies to persons who have enabled the escape of criminal defendants under indictment but who are not yet convicted.  *See* Watanabe Declaration at ¶12 ("'[A]nother person who has . . . committed a crime punishable with a fine or greater punishment' . . . includes . . . a person whose criminal case is pending before the court after the indictment.").

the escapee, which the escapee then used to stay at a hotel under a pseudonym (the defendant's name). *Id.*  Notably, the Taylors have not cited any case where a Japanese court held that Article 103 cannot apply to situations where the defendant enabled the escape of a person who had been released on bail. *See id.*

Notwithstanding the plain language of the statute and the caselaw, the Taylors argue that they did not "enable[] the escape" of Ghosn within the meaning of Article 103, even though they assisted him with hiding in a box, fleeing Japan aboard a private jet, and absconding to a country with no extradition treaty with Japan, all in an effort to avoid his ongoing criminal proceedings.  The Court should reject the Taylors' attempt to define "escape" in a manner substantially different from its ordinary meaning.  *Cf., e.g.*, *Taniguchi* v. *Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."); *Sandifer* v. *United States Steel Corp.*, 134 S. Ct. 870, 876 (2014) ("It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'") (quoting *Perrin* v. *United States*, 444 U.S. 37, 42 (1979)).  Japan further confirms that the term "enables the escape" broadly encompasses "any acts that impede the arrest or detection by government officials . . . ."  Watanabe Declaration at ¶9.

The Taylors claim that other Japanese statutes (Articles 97 and 98), which are not at issue here, support their cramped definition of "escape," whereby the escapee must be fleeing the scene of a crime or fleeing a detention facility.  But as Japan makes clear, those other statutes are inapplicable because, among other reasons, they use different Japanese characters to describe those separate offenses.  *See* Watanabe Declaration at ¶10 (Article 103 uses the term 隠避 or inpi whereas Articles 97 and 98 use the

term "逃走" or "*toso*").[20]   Accordingly, for purposes of Article 103, "[i]t does not matter whether the person is kept in custody or not: a person who is on bail after indictment still constitutes 'another person who has . . . committed a crime.'"  *Id.* at ¶12.

The Taylors emphasize the fact that "bail jumping" is not a crime in Japan.  This argument misses the mark because Article 103, the offense that the Taylors are alleged to have violated, is an independent offense that is not predicated on the existence of any other crime.  *See* Watanabe Declaration ¶13 ("It does not matter whether Ghosn himself could be tried and convicted for committing a separate offense in connection with his flight from Japan, although there is a warrant for his arrest based on violating Japanese immigration laws.").  Similarly, the Taylors' arguments regarding Japanese punishments for accessories to a crime are misplaced because the Taylors are alleged to have acted as principals under Article 103 rather than as accessories.  *See id.* ("A person who commits the crime of enabling the escape under Article 103 shall be punished as a principal, not an accessory to another person who escapes, because Article 103 intends to punish a person who enables the escape on the basis that the person has obstructed Japan's administration of justice . . . .  As both Michael Taylor and Peter Taylor committed enabling the escape as a principal, not an accessory, Article 63 of the Penal Code is not applied to the violation of Article 103 in this case.").

The Taylors also claim that it is unfair to charge them with enabling Ghosn's escape when Ghosn cannot be punished for bail jumping.  However, the caselaw is clear and uniform that such an argument falls outside the scope of an extradition hearing, much less does it constitute a basis to quash the arrest warrants.  *See, e.g.*, *Neely v. Henkel*, 180 U.S. 109, 123 (1901) ("When an American citizen

---

[20] The term "'toso' . . . has the same concept[] as "'escaped from confinement' . . . ."  Watanabe Declaration at ¶10.  However, the plain language of Article 103 reflects the fact that it is meant to cover situations other than when the escapee is in confinement.  *See id.* at ¶8 (Article 103 of the Penal Code applies to persons who enable the escape of someone "who has *either* committed a crime punishable with a fine or greater punishment *or* has escaped from confinement") (emphasis added).

commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people[.]"); *Hilton v. Kerry*, 754 F.3d 79, 84–85 (1st Cir. 2014) (the rule of non-inquiry "bars courts from evaluating the fairness and humaneness of another country's criminal justice system, requiring deference to the Executive Branch on such matters."); *Kin-Hong*, 110 F.3d at 110 ("Under the rule of non-inquiry, courts refrain from investigating the fairness of a requesting nation's justice system") (internal quotation marks and citation omitted).  It also bears note that under the federal laws of the United States a person can be charged with obstructing justice even where no other crime has been committed.  *See, e.g.*, 18 U.S.C. § 1001; 18 U.S.C § 1512; 18 U.S.C § 1621.

### 3. The Taylors' probable cause arguments do not save their premature and meritless claims.

#### a.   The government has satisfied any probable cause requirement for the Taylors' provisional arrests.

Contrary to the Taylors' claim, the Complaints satisfy any probable cause requirement for the Taylors' provisional arrests, and the Japanese arrest warrants and the Watanabe Declaration make that fact doubly clear.  The Taylors argue that the probable cause standard for a provisional arrest is identical to that which is required for a domestic criminal arrest.  For the reasons discussed *infra*, that is not true. But even if the Taylors were correct, that would not constitute grounds for the Court to grant their Motion because the government met the probable cause standard for a domestic criminal arrest.

For a domestic criminal arrest, probable cause is "defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense."  *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). Here, the detailed factual allegations in the Complaints regarding the Taylors' facilitation of Ghosn's escape from Japan while he was on bond are plainly sufficient for a reasonably prudent person to believe

31

that the Taylors had committed a criminal offense.  Moreover, Japan confirms that enabling the escape of a criminal defendant is a cognizable offense under Article 103 of the Japanese Penal Code and that the statute covers the Taylors' alleged conduct.

Courts routinely reject probable cause challenges at the provisional arrest stage where, as here, the government has provided a sworn complaint providing a detailed description of the alleged crime and the sources of evidence supporting those allegations.  *See, e.g., In re the Matter of Extradition of Beresford-Redman*, No. CR 10-2780M, 2010 WL 5313494, at *8 (C.D. Cal. Dec. 17, 2010)  (rejecting probable cause challenge to provisional arrest where "the Complaint is replete with specifics about how the facts were obtained"); *see also, e.g., In re Extradition of Boeyink*, No. 2:04m30, 2004 WL 6074945, at *2 (E.D. Va. Jan. 28, 2004); *Gohir*, 2014 WL 2123402, at *1; *Spatola*, 1989 WL 62993, at *1.

The cases cited by the Taylors where provisional arrest warrants were quashed for lack of probable cause are inapposite because, unlike here, they were deemed to be factually inadequate.  *See Caltagirone*, 629 F.2d at 743 (no probable cause where the complaint simply "alleg[ed] the existence of the Italian warrants"); *Parretti v. United States*, 122 F.3d 758 (9th Cir. 1997), *opinion withdrawn and appeal dismissed on other grounds*, 143 F.3d 508 (9th Cir. 1998) (en banc) ("[T]he government's probable cause showing consisted of nothing more than naked allegations.").  The Taylors' heavy reliance on *Parretti* is misplaced for the additional reason that the panel decision was vacated under the fugitive disentitlement doctrine after the fugitive fled and before the Ninth Circuit had an opportunity to review the decision *en banc*—a fate that the government seeks to avoid here in requesting the Taylors' detention—and thus has no precedential value even within the Ninth Circuit.  The Taylors have not alleged a similar factual deficiency with the Complaints, nor could they do so.  *See* Docket No. 13 (noting the Complaints contained a "detailed narrative . . . summarizing [the Taylors'] alleged conduct").

###### b. In any event, the probable cause requirement for provisional arrests is distinct from the standard applied in domestic criminal arrests.

Because the government has satisfied the probable cause standard for domestic criminal arrests, this Court need not decide whether the same burden applies to provisional arrest requests. *See, e.g.*, *Sahagian v. United States,* 864 F.2d 509, 513 n.4 (7th Cir. 1988) ("Because there was a showing of probable cause to support Sahagian's arrest and detention, we need not venture into this [probable cause] debate or decide whether the debate even has any applicability when the United States seeks the provisional arrest and detention of a person."); *In re Extradition of Russell,* 805 F.2d 1215, 1217 (5th Cir. 1986) ("Assuming without deciding that the Treaty requires a showing of probable cause to support a provisional arrest before an extradition hearing, we agree with the district court that the magistrate had enough evidence before him to show probable cause to detain Russell."); *Beresford-Redman*, 2010 WL 5313494, at *3 ("This Court concludes that it need not resolve whether Article 11 of the Extradition Treaty or section 3184 requires probable cause because the provisional arrest warrant in this case is amply supported by probable cause."); *Boeyink*, 2004 WL 6074945, at *2 (E.D. Va. Jan. 28, 2004) ("Because the United States has submitted sufficient evidence to establish probable cause, however, the Court refrains from making any ruling on the constitutional necessity of a probable cause determination.").

However, to the extent that the Court believes it is necessary to reach this issue, the Court may find probable cause for purposes of issuing a provisional arrest warrant based on a showing that the person whose arrest is sought is the person named in a duly issued foreign arrest warrant charging an extraditable offense. The government has met this standard. Contrary to the Taylors' claims, neither the Treaty, the Fourth Amendment to the U.S. Constitution, nor the caselaw compels a different result.

33

### i.     The Treaty supports a distinct standard for provisional arrests.

The Treaty's plain language evidences the intent of the parties to reserve for the extradition hearing the determination of whether the probable cause standard for domestic criminal arrests has been met.  The Treaty's provisional arrest provision, Article IX, contains no mention of probable cause. Rather, it provides as follows:

> In case of urgency the requested Party may provisionally detain the person to be sought when the requesting Party submits an application for provisional detention through the diplomatic channel, notifying the requested Party that a warrant of arrest has been issued or a sentence imposed for an offense for which extradition is to be granted in accordance with paragraph 1 of Article II and assuring the requested Party that a request for extradition will be made. The application for provisional detention shall describe the identity of the person to  be sought and the facts of the case, and shall contain such further information as may be required by the laws of the requested Party.

The absence of any mention of probable cause in Article IX stands in sharp contrast to Article III and Article VIII's explicit probable cause requirement for the formal extradition request and the ultimate extradition decision.  *See* Treaty, Art. III ("Extradition shall be granted only if there is sufficient evidence to prove . . . that there is *probable cause* to suspect, according to the laws of the requested Party, that the person sought has  committed the offense for which extradition is requested . . . .") (emphasis added); Treaty, Art. VIII (the request for extradition shall be accompanied by "[s]uch evidence as would provide *probable cause* to suspect, according to the laws of the requested Party, that the person sought has committed the offense for which extradition is requested.") (emphasis added).  The lack of any reference to the domestic probable cause requirement in Article IX of the Treaty demonstrates that the parties did not intend to impose the same requirement for provisional arrests.

The fact that the parties to the Treaty did not intend to impose the probable cause standard for domestic criminal arrests on provisional arrests is also evident by a comparison to other treaties

that were signed around the same time period and specifically included a probable cause requirement for provisional arrests.  This includes the Italian treaty at issue in the Second Circuit's *Caltagirone* decision, which was signed five years prior to the Japanese treaty and which explicitly states that the requesting country must provide such information "as would be necessary to justify the issue of a warrant of arrest had the offense been committed . . . in the territory of the requested Party."  *See* 629 F.2d at 744.  The parties to the Treaty at issue here, however, chose different language, incorporating the more flexible requirement of "such further information as may be required by the laws of the requested Party."  *See* Treaty, Art. IX.[21]

### ii.     The Fourth Amendment does not compel a different result.

Contrary to the Taylors' claims, the Fourth Amendment is not so inflexible as to preclude a probable cause standard that is compatible with the unique nature of provisional arrests as a preface to the initiation of extradition proceedings.  To be clear, the government certainly does not dispute the applicability of the Fourth Amendment's Warrant Clause and its command that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ."  U.S. Const. amend. IV.  However, the Warrant Clause does not itself define the substantive showing of probable cause required in different contexts.  Probable cause is simply a degree of certainty, not a degree of certainty of a particular thing.  While the degree of certainty required by the Warrant Clause remains constant, the object for which that degree of certainty must be demonstrated varies depending on the purpose for which the warrant is sought.

---

[21] Even if there were any ambiguity as to what Article IX requires, well-established canons of treaty construction mandate that it be construed liberally, and therefore not to impose the probable cause requirement for domestic criminal arrests.  *See Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933) ("[I]f a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."); *Grin*, 187 U.S. at 184 (extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers"); *Kin-Hong*, 110 F.3d at 110 ("[E]xtradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement . . . ."); *In re Extradition of Howard*, 996 F.2d at 1330-31; *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc).

As discussed above, probable cause for a domestic criminal arrest requires "facts and circumstances sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Gerstein*, 420 U.S. at 111 (internal quotation marks and citation omitted). This standard "represents a necessary accommodation between the individual's right to liberty and the State's duty to control crime" and offers "a practical, non-technical conception affording the best compromise that has been found for accommodating these often opposing interests." *Id.* at 112 (citation omitted). The probable cause showing required thus results from a balancing of interests that reflects the purpose for which the warrant is sought. Where the purpose of the warrant is something other than a domestic criminal arrest, the balancing of interests and the resulting showing required are correspondingly different. Thus, for example, administrative searches subject to the Warrant Clause need not be supported by a showing of "[p]robable cause in the criminal law sense[.]" *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978); *see also Plum Creek Lumber Co. v. Hutton*, 608 F.2d 1283, 1287 (9th Cir. 1979) (rejecting arguments that "Fourth Amendment makes no distinction between the probable cause standard in the criminal sense and the standard for administrative searches").

Here, the Taylors were provisionally arrested with a view towards Japan's formal request for their extradition. The showing of probable cause required for such an arrest requires a focus on its ultimate object—the seizure of the fugitive not for domestic criminal prosecution but solely pending the submission of a request for his extradition pursuant to treaty so that he may answer a preexisting foreign arrest warrant and face prosecution in the foreign country. Consideration of this object, the individual and government interests it implicates, and the practicalities involved in provisional arrest support the probable cause standard urged by the government. Conversely, applying the probable cause standard for domestic arrests would disregard key distinctions between criminal and extradition proceedings, which include the following:

36

- Extradition proceedings pursuant to treaty are not criminal in nature, *see Martin v. Warden*, 993 F.2d 824, 828 (11th Cir. 1993), and the ultimate purpose of an extradition proceeding is not a finding of guilt beyond a reasonable doubt, but rather a determination of whether "a case is made out which will justify the holding of the accused and his surrender to the demanding nation," *Ward v. Rutherford*, 921 F.2d 286, 287-88 (D.C. Cir. 1990). The different purpose served by extradition proceedings suggests the common-sense inference that the probable cause showing required to support a provisional arrest, the first step in such a proceeding, need not be the same as the probable cause showing required to support a domestic criminal arrest.

- The judicial officer's role in the extradition process is not constitutionally mandated but rather is a creature of statute. *See, e.g., Lo Duca v. United States*, 93 F.3d 1100, 1103 n.2 (2d Cir. 1996) ("In the absence of section 3184, the Executive Branch would retain plenary authority to extradite."). The absence of any constitutionally compelled judicial role in provisional arrests is reflective of the different balance of interests implicated in provisional arrests, as opposed to domestic criminal arrests.

- Before a request for a provisional arrest warrant reaches a United States judicial officer, duly authorized foreign officials must have issued their own arrest warrant.[22] Principles of international comity support the proposition that the appropriate probable cause showing does not require inquiry into the facts underlying a validly issued foreign warrant at the provisional arrest stage.

- The government has additional interests beyond those in domestic criminal cases when it comes to executing provisional arrest requests. Speedy, smooth compliance with extradition treaties promotes general goodwill with foreign nations that may extend into other areas of foreign policy; conversely, our failure to honor or act upon treaty obligations may render a foreign country implacable in another area of our international relations with it. Thus, the government's interest in honoring its treaty obligations is not merely commensurate with its interest in enforcing its own laws—it encompasses that interest and extends beyond it.

- Requiring the same standards for domestic criminal arrests could pose insurmountable practical barriers to submitting provisional arrest requests in time for their execution. In a world of rapid international travel, fugitives may be present in the United States for only a short time. To demand the showing of probable cause required for domestic criminal arrests will in many cases make provisional arrest a practical impossibility, not because of any lack of evidence, but simply because there is insufficient time for the foreign officials to gather, translate, and forward through the required diplomatic channels the information required to satisfy that standard. The Fourth Amendment's probable cause requirement was never intended to pose such unyielding technical

---

[22] In addition, a request for provisional arrest must have been forwarded by the foreign government to the United States in accordance with treaty procedures approved by both the Executive and the Senate, and that request must have been reviewed by representatives of both the State Department and the Department of Justice.

hurdles to either searches or arrests or to impede this country's ability to meet its treaty obligations.    To the contrary, built into the Fourth Amendment is the "flexibility" necessary to deal with "delays caused by paperwork and logistical problems." *County of Riverside v. McLaughlin*, 500 U.S. 44, 55 (1991).

Contrary to the Taylors' claim, the applicable caselaw does not compel a different result.  The Taylors have not cited any First Circuit caselaw imposing the probable cause standard for domestic criminal arrests at the provisional arrest stage, and the government is not aware of any such controlling precedent.  Indeed, the First Circuit in *Kin-Hong* made no mention of probable cause in its articulation of the standard for issuing an arrest warrant in the extradition context.  *See Kin-Hong*, 110 F.3d at 109. Other courts have explicitly rejected the domestic probable cause standard.  *See, e.g., In re Garcia*, 615 F. Supp. 2d 162, 167-68 (S.D.N.Y. 2009) (finding "no basis for Garcia's claim that the Philippines had to submit documentation sufficient to show probable cause before his provisional arrest could occur in the United States."); *Matter of Extradition of Hamilton–Byrne,* 831 F. Supp. 287, 294 (S.D.N.Y. 1993) ("In the context of an arrest prior to a request for extradition, the Government must demonstrate that probable cause exists to believe that the persons sought are subject to extradition pursuant to a treaty."); *see also United States v. Wiebe*, 733 F.2d 549, 553–54 (8th Cir. 1984) (rejecting fugitive's probable cause challenge to his provisional arrest where "[t]he complaint alleged that [the fugitive] was wanted for murder in Spain and that murder was an extraditable offense under an extradition treaty between the United States and Spain.").  As discussed above, the Second Circuit's decision in *Caltagirone* is distinguishable because it was interpreting a treaty that was found to incorporate the domestic probable cause standard, 629 F.2d at 748, and the Ninth Circuit's panel decision in *Parretti* was vacated after the fugitive fled during extradition proceedings.  *See* 143 F.3d at 509.

Given the Fourth Amendment's recognition of the need for flexibility, and the distinctly different purpose, interests, and practicalities involved, the Court should leave for the extradition hearing itself the probable cause showing required for domestic criminal arrests, as envisioned by the

38

Treaty and the extradition statute. Such a position does not encroach on Fourth Amendment protections—it simply recognizes that the object of a provisional arrest is different from that of a domestic criminal arrest, and that the probable cause showings required are correspondingly different.

## CONCLUSION

For the foregoing reasons, the Taylors' Motion should be denied.


Date: June 16, 2020

<div style="margin-left: 50%">

Respectfully submitted,


ANDREW E. LELLING
United States Attorney

By:    */s/ Stephen W. Hassink*
       STEPHEN W. HASSINK
       Assistant United States Attorney

       */s/ Philip A. Mirrer-Singer*
       Philip A. Mirrer-Singer
       Trial Attorney
       Office of International Affairs
       Criminal Division
       U.S. Department of Justice
       1301 New York Avenue NW
       Washington, D.C. 20530
       Tel: (202) 514-3891
       Fax: (202) 514-0080

</div>

## CERTIFICATE OF SERVICE

I, Stephen W. Hassink, Assistant U.S. Attorney, do hereby certify that on June 16, 2020, I served a copy of the foregoing on all registered parties by electronic filing on ECF.

<div style="margin-left: 50%">

*/s/ Stephen W. Hassink*
Stephen W. Hassink
Assistant U.S. Attorney

</div>

39