UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF MICHAEL L. TAYLOR | No. 20-mj-1069-DLC |
| IN THE MATTER OF THE EXTRADITION OF PETER M. TAYLOR | No. 20-mj-1070-DLC |

**MEMORANDUM ON RESPONDENTS' MOTION TO QUASH ARREST WARRANTS OR FOR RELEASE FROM DETENTION**

CABELL, U.S.M.J.

## I. <u>INTRODUCTION</u>

In January 2020, a Japanese court issued arrest warrants for respondents[1] Michael Taylor and his son, Peter Taylor, for allegedly facilitating the escape of former Nissan CEO Carlos Ghosn from Japan, where Ghosn was facing significant criminal charges, to Lebanon. The warrants sought the Taylors' arrests for the "harboring of criminals and accessoryship of violation of the Immigration Control and Refugee Recognition Act (Article 71, 25 II) case." (D. 17-1, 17-2).

After learning that the respondents had returned to the United States from the United Arab Emirates, which has no extradition treaty with Japan, the government of Japan requested that the

---

[1] The requested party in an extradition proceeding has been referred to by various names over time, including "defendant," "respondent," "petitioner" or "relator." *See, e.g., United States v. Ramnath*, 533 F. Supp. 2d 662, 664 n.2 (E.D. Tex. 2008). When not referring to the Taylors by their proper names, the court uses the term "respondent" here.

United States issue provisional arrest warrants for the respondents pursuant to the two countries' joint extradition treaty.   (D. 1); Treaty on Extradition, U.S.-Japan, art. IX, *effective* Mar. 26, 1980, 31 U.S.T. 892 (the Treaty).   On May 6, 2020, the United States filed a complaint in support of the respondents' provisional arrests towards extradition.   The complaint indicated among other things that Japanese officials had charged the Taylors with violating Article 103 of the Japanese Penal Code, which prohibits one from harboring a criminal or helping the criminal to escape.[2]   This court issued the requested provisional arrest warrants and the respondents were arrested on May 20, 2020.   (D. 8).

Against that backdrop, the respondents moved on June 8, 2020 to quash the provisional arrest warrants or alternatively to be released on bail pending a formal extradition hearing.   (D. 17). The court convened a hearing on the motion on June 22, 2020.   (D. 30).   Subsequently, on June 29, 2020, and while the motion was still pending, Japan submitted its formal request for the respondents' extradition to the State Department (D. 37), effectively mooting any issues relating to the legitimacy of the provisional arrest warrants, and leaving only the issue of bail

---

[2] Article 103 provides as follows:  "A person who harbors or enables the escape of another person who has either committed a crime punishable with a fine or greater punishment or has escaped from confinement shall be punished by imprisonment with work for not more than 2 years or a fine of not more than 200,000 yen."

for consideration. *See, e.g., Martinez v. United States*, 828 F.3d 451, 470 (6th Cir. 2016) (since provisional arrest ended when Mexico submitted its formal extradition request, challenges to provisional arrest were moot); *United States v. Yee-Chun*, 657 F. Supp. 1270, 1271 n.1 (S.D.N.Y. 1987) (same). On July 7, 2020, the court issued an order denying the respondents' motion for bail.[3] This memorandum sets forth the court's reasoning.

## II. <u>FACTUAL ALLEGATIONS</u>

As the world entered the year 2020, it learned that Ghosn, awaiting trial in Japan on serious financial charges, had fled from Japan to Lebanon to avoid prosecution. Notably, Lebanon has no extradition treaty with Japan, seriously impacting the possibility of bringing Ghosn to trial. Japan contends that the respondents masterminded Ghosn's escape.

According to the government's complaint, immigration documents and surveillance video indicate that Peter Taylor traveled to Japan at least three times and visited Ghosn on at least seven occasions in the months preceding the escape.[4] Then, on December 28, 2019, Peter Taylor arrived in Tokyo and checked into a room at the Grand Hyatt. Ghosn then arrived at the Grand Hyatt and met with Peter Taylor for about an hour.

---

[3] Both parties submitted post-hearing supplemental pleadings which the court has considered in ruling on the respondents' motion.

[4] Authorities installed surveillance video at Ghosn's Japanese home as a condition of his bail.

On December 29, 2019, Michael Taylor and a third individual, George-Antoine Zayek, traveled on a private jet from Dubai, United Arab Emirates, to Japan's Kansai International Airport.  At Kansai, Michael Taylor and Zayek carried large black audio equipment-style cases and told airport workers that they were musicians.

From Kansai, Michael Taylor and Zayek checked into the Star Gate Hotel Kansai.  After placing the cases in one of their rooms, they caught a train bound for Tokyo at about noon.

At 2:30 p.m., also on December 29th, Ghosn left his home without luggage and walked to the Grand Hyatt, where he apparently changed into clothing from luggage that had been dropped off and received by Peter Taylor earlier in the day.  Michael Taylor and Zayek arrived in Tokyo at about 3:30 p.m. and went to Peter Taylor's room at the Grant Hyatt.  Shortly thereafter, the Taylors, Ghosn, and Zayek left Peter Taylor's room at the same time, each carrying luggage.

Peter Taylor then traveled to the Narita Airport to catch a flight to China.  However, Ghosn, Michael Taylor, and Zayek caught a train back to the Kansai Airport area and returned to the Star Gate Hotel Kansai at approximately 8:15 p.m.  At about 10:00 p.m., Michael Taylor and Zayek left the hotel with luggage, including the two audio-style cases, and went to Kansai Airport. Surveillance footage did not show Ghosn leaving the hotel.

Once at the airport, the baggage of Michael Taylor and Zayek was loaded onto their private jet without being checked.  The jet departed for Turkey at about 11:00 p.m.  On December 31, 2019, Ghosn announced that he was in Lebanon.

## III.  **DISCUSSION**

### A. Legal Standard

Extraditions are not regular criminal proceedings and the familiar standards of the Bail Reform Act, 18 U.S.C. §3141, therefore do not control.  *See, e.g., Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984).  Instead, there is a presumption against bail in extradition cases and in favor of detention, and respondents must demonstrate "special circumstances" that justify their release on bail.  *United States v. Kin-Hong*, 83 F.3d 523, 524 (1st Cir. 1996) (citing *Wright v. Henke*l, 190 U.S. 40, 63 (1903)).  The rationale behind the presumption against bail is that "extradition cases involve an overriding national interest in complying with treaty obligations" and ensuring that the putative extraditee is delivered to the requesting country.  *United States v. Taitz*, 130 F.R.D. 442, 444 (S.D. Cal. 1990).

Determining whether a case presents special circumstances is a case specific endeavor and "the list of potential 'special circumstances' is not limited to those previously recognized in published decisions."  *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 56 (D. Mass. 2010) (citing *In re Extradition of*

*Gonzalez*, 52 F. Supp. 2d 725, 736 (W.D. La. 1999)).  Special circumstances, though, have typically been limited to those "situations where 'the justification is pressing as well as plain,' ... or 'in the most pressing circumstances, and when the requirements of justice are absolutely peremptory.' "  *In re Extradition of Drumm,* 150 F. Supp. 3d 92, 96 (D. Mass 2015) (quoting *United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979) (citations omitted)).  Courts therefore have found that bail is appropriate only where the respondent's circumstances are "extraordinary" and will subject the respondent to difficulties beyond those "applicable to all defendants facing extradition." *Id.* (citing *In re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1216 (D. Nev. 1993) (citations omitted)).

Accordingly, courts have granted bail in only truly remarkable circumstances and often when multiple special circumstances bear in the respondent's favor.  *See e.g., Castaneda-Castillo*, 739 F. Supp. 2d at 58-64 (combination of charge pending in Peru more than twenty-five years, incarcerated five years pursuing amnesty petition, facing lengthy extradition proceeding); *In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1035-1036 (C.D. Cal. 2006) (combination of delay and a high degree of uncertainty regarding the merits of the request for extradition); *In re Extradition of Molnar*, 182 F. Supp. 2d 684, 687 (N.D. Ill. 2002) (combination of financial assistance to

seriously ill mother, circumstances of arrest, lengthy extradition proceedings, and criminal charges dropped and then reinstated when petitioner left Hungary); *see also Hu Yau-Leung v. Soscia*, 649 F.2d 914 (2d Cir. 1981) (absence of a suitable facility in which to detain juvenile extraditee); *In re Mitchell*, 171 F. 289, 290 (S.D.N.Y. 1909) (risk of petitioner's loss of "all his fortune" if not permitted to complete his participation in a civil proceeding underway at the time of his arrest).

In addition to establishing special circumstances, a respondent must show by clear and convincing evidence that he is neither a flight risk nor a danger to the community. *Castaneda-Castillo*, 739 F. Supp. 2d at 55. Special circumstances and flight risk/danger are both prerequisites to establishing entitlement to bail in an extradition case and a court logically can address either prong first. *United States v. Ramnath*, 533 F. Supp. 2d 662, 665 n.3 (E.D. Tex. 2008).

**B.   Special Circumstances**

Turning first to the issue of special circumstances, the respondents argue that special circumstances exist in this case because: (1) they have a high likelihood of success on the merits with respect to the Japanese criminal prosecution; (2) they have already been adjudicated "not guilty" by a third country; (3) Michael Taylor has significant family responsibilities; and (4) detention will subject the respondents to a high risk of exposure

to the COVID-19 virus.  The respondents argue further that even if each of these circumstances alone is insufficient to constitute a special circumstance, they constitute a special circumstance when considered together.  The court addresses each of the grounds separately and then as a whole.

     1. *Likelihood of Success on the Merits*

The Taylors contend that the underlying criminal case against them is fatally flawed.  Some courts have held that a "high probability" or "substantial likelihood" of success in defeating the anticipated foreign prosecution may appropriately qualify as a special circumstance.  *See, e.g., Kin-Hong,* 83 F.3d at 524-25 ("high probability of success"); *Salerno v. United States,* 878 F.2d 317 (9th Cir. 1989) ("high probability of success"); *Ramnath,* 533 F. Supp. 2d at 682 ("substantial likelihood"); *Taitz*, 130 F.R.D. at 444 ("high probability of success").  Although not all courts agree, *see, e.g., United States v. Risner,* No. 3:18-MJ-765-BN, 2018 WL 6809796, at *12 (N.D. Tex. Dec. 27, 2018), this court presumes that a high probability or substantial likelihood of success may qualify as a special circumstance.

The Taylors argue that even assuming they helped Ghosn flee Japan, their conduct was not unlawful because Penal Code Article 103 does not make it criminal to assist a person's escape unless that person escapes from "confinement." According to the Taylors, the term "confinement" under Japanese law means actual physical

8

detention, and Ghosn was not confined at the time of his escape because he had been released on bail.  Thus, while Ghosn may have "jumped bail," he did not escape from confinement within the meaning of Article 103.  Consequently, contend the Taylors, they cannot be found to have violated Article 103 where Ghosn was not confined.  To underscore this point, the respondents have submitted various news articles as well as the declaration of a professor from a Japanese law school noting that "bail jumping" itself is not a crime in Japan.  The court credits the respondents' assertion that "bail jumping" is not a crime in Japan but still does not find this argument persuasive.

The principal problem with the respondents' argument is that it simply ignores other unambiguous language in Article 103 providing that the provision also applies to anyone who "harbors or enables the escape of another person who has. . .committed a crime," without regard to whether the criminal was or was not in confinement.  The respondents would appear to fall squarely within the heartland of this portion of Article 103 where Ghosn had been charged with a crime and the respondents then reportedly harbored and/or helped him to escape to avoid prosecution.  Even assuming that Ghosn himself did not violate Article 103 when he escaped while on bail, that to this court is immaterial and would appear to have no bearing on whether the respondents may be prosecuted as

principals[5] for harboring or enabling the escape of someone who committed a crime.

Notably, the government has cited to authority provided through the declaration of the Japanese prosecutor that Article 103 has indeed been used previously to successfully prosecute an individual who helped someone who was indicted but not in confinement to escape.  (Declaration of Naoki Watanabe, D. 23-2, ¶ 12).  The respondents argue that the offered precedent is distinguishable and not analogous.  Perhaps, perhaps not, but the court is not versed in the nuances of Japanese criminal law and is loath to attempt to decide an issue that should most appropriately be decided by a Japanese court.  *See, e.g., Skaftouros v. United States*, 667 F.3d 144, 156 (2d Cir. 2011) ("[I]t has long been recognized that an extradition judge should avoid making determinations regarding foreign law.").  In any event, the respondents have not pointed to any authority holding or suggesting that Article 103 cannot apply to someone who harbors a bailed defendant or helps him to escape.

In sum, even assuming *arguendo* that the respondents have a potentially non-frivolous legal defense, they have not here shown

---

[5] The respondents also contend that because bail jumping is not a crime in Japan, punishing the respondents where Ghosn could not be punished would run afoul of another provision of Japan's Penal Code, Article 63, which provides that the punishment of an accessory shall be less than that for a principal. As with their primary argument, however, this argument fails to appreciate that the respondents have not been charged as accessories to Ghosn's bail jumping, but rather have been charged as principals for harboring or enabling a criminal's escape.

a "high probability" or "substantial likelihood" of success on the merits.   This ground therefore does not constitute a special circumstance.

### 2. *Prior Adjudication by a Third Country*

The respondents ask the court to consider that a third country, Lebanon, has already considered their conduct and determined that they did not commit a crime.   In support of this claim, the respondents have submitted a declaration from a Lebanese attorney who claims that the Lebanese prosecutor overseeing the investigation of the Taylors in Lebanon "close[d] the case" after a family member of the Taylors asked the prosecutor to "proceed with the investigation."   According to the Lebanese attorney (as opposed to the prosecutor), the closing of the case rendered the respondents "not guilty before Lebanese jurisdictions of any criminal act in the alleged unlawful departure of Mr. Carlos Ghosn from Japan . . . ."   (Declaration of Naoum Toubia Farah, D. 17-11).

The Taylors argue that this development constitutes a special circumstance because Article IV, Section 2 of the Treaty provides that "[t]he requested Party may refuse extradition when the person sought has been tried and acquitted, or has undergone the execution of punishment in a third State for the offense for which extradition is requested."   As such, the respondents suggest that they stand a more colorable chance of avoiding extradition as a

result of the Lebanese prosecutor's declination.  This argument has no force.  To state the obvious, the respondents were apparently not even charged with an offense in Lebanon, let alone "tried and acquitted."  The Treaty provision cited is thus not even remotely implicated and provides no basis for relief here. Moreover, because considerations of whether to grant or refuse extradition rest exclusively with the Executive branch, and would not take place until much later, after a court has determined extraditability, the possibility of obtaining protection through this Treaty provision is simply too speculative a ground at present to constitute a special circumstance warranting bail.

### 3. *Family Responsibilities*

Michael Taylor argues that he has significant family responsibilities militating in favor of his release.  Among other things, he claims (and the court credits) that he has been the sole caregiver for his 81-year-old adoptive stepfather, who suffers from many health issues, and his detention therefore would cause a significant struggle for the Taylor family, who have had to ask another of Mr. Taylor's sons as well as neighbors to assist in his absence.

The court is sympathetic to Mr. Taylor's situation and credits that his continued detention would meaningfully disrupt the routine of care previously in place to address his stepfather's needs.  As the government notes, though, detention commonly acts

to deprive a family or loved one of the support of a helpful and vital member. Extradition courts for that reason have rejected familial caretaking responsibilities as a special circumstance. *See, e.g., In re Extradition of Russell*, 805 F.2d 1215, 1217 (5th Cir. 1986) ("[F]inancial and emotional hardship [on family members is] present in almost all cases."); *Drumm*, 150 F. Supp. 3d at 99–100 (citing *Castaneda-Castillo*, 739 F. Supp. 2d at 57) (providing financial and emotional support not a special circumstance); *Duca v. United States*, No. 95-cv-713, 1995 WL 428636, at *15, 16 (E.D.N.Y. July 7, 1995) (finding wife's advanced dementia not to constitute a special circumstance), *aff'd sub nom. Lo Duca v. United States*, 93 F.3d 1100 (2d Cir. 1996). Accordingly, Mr. Taylor's family responsibilities do not constitute a special circumstance weighing in favor of release.

4. *Issues Relating to COVID-19*

The respondents argue without great elaboration that "an outbreak" of the COVID-19 virus at the Norfolk County Correctional Facility (Norfolk) where they are being held should be deemed a special circumstance warranting bail. The health concerns relating to the virus are well known but the court does not find them to be a special circumstance on the basis of the present record.

As an initial matter, the respondents offer little information to meaningfully assess the severity of the risk of

exposure or infection should they remain detained at Norfolk pending the resolution of the extradition proceedings.  To be sure, they note, and the court credits, that the number of people testing positive for the virus at Norfolk increased from four to 35 between May 26 and June 18, 2020.  They assert further that Michael Taylor is 59 years old and has had part of one lung removed due to a fungal infection, which may place him at a higher risk of complications from COVID-19 than the general public.

That being said, the respondents fail to provide medical records for Michael Taylor or any physician's opinion that he is at a particularly greater risk for complications should he contract the virus.  Moreover, the government has submitted the unrefuted declaration of the Assistant Deputy Superintendent at Norfolk, who avers among other things that no one housed in the unit where the respondents are being held has tested positive for the virus.  Further, the facility continues to employ significant measures to ensure the safety of its population, including placing new detainees in quarantine for 14 days; suspending family and friend visits; requiring the use of masks; and cleaning housing units three times per day.  (D. 23-4, Declaration of Danielle Boomhower).

The court is mindful that the severity of the risks posed to any detainee by the COVID-19 virus depends on several variables and may change quickly, such that conditions at Norfolk could at

some future point yet constitute a special circumstance.  The record does not support such a finding at present, however.

   5. *Combination of Circumstances*

   Finally, the respondents argue that the grounds offered above amount to a special circumstance if considered together, even if no ground standing alone suffices.  For the reasons noted above, however, none of the grounds offered is exceptional and they fail in the court's view to amount to a special circumstance even when viewed in the aggregate.  Even were the court to conclude otherwise, detention would still be warranted because the respondents have not demonstrated by clear and convincing evidence that their release would not pose an unreasonable risk of flight.

   **C. Risk of Flight and Danger to the Community**

   As noted, a respondent bears the burden of demonstrating by clear and convincing evidence that he is neither a risk of flight nor a danger to the community.  *Drumm*, 150 F. Supp. 3d at 96.  No one seriously argues that the respondents' release would pose a danger to the community.  The government argues however that each poses an "exceptional" risk of flight.

   1. *Michael Taylor*

   In arguing that he does not pose a flight risk, Michael Taylor stresses that he voluntarily returned to the United States from Lebanon despite knowing of the Japanese warrants and the existence of the extradition treaty.  He concedes that he

has strong ties to Lebanon, where his wife is from and where he owns a home, but contends that he returned to the United States on his own, despite these ties, and despite the fact that remaining in Lebanon would have effectively shielded him from an extradition process he knew was likely to ensue.

Mr. Taylor further points out that he has on two prior occasions in 2007 and 2012 returned to the United States to answer charges against him.  With respect to the 2012 charges, Mr. Taylor states that while he did plead guilty to honest services wire fraud, he was eventually released for 16 months pending sentencing and during that time fully complied with all conditions of release, and even assisted federal law enforcement in a complex overseas investigation.

Finally, Mr. Taylor offers that the maximum punishment for his alleged offense in Japan is three[6] years, and likely to be less in reality, giving him little incentive to flee.

The points raised by Mr. Taylor are not insubstantial and in a routine domestic criminal matter might provide a strong basis to warrant release on bail with conditions.  In this case, however, they fail in light of the charges and Mr. Taylor's past to persuade by clear and convincing evidence that he is not likely to flee.  As the magistrate judge, district judge, and

---

[6] The maximum penalty under Article 103 is in fact two years.

Tenth Circuit Court of Appeals all agreed in Mr. Taylor's 2012 case, there was "ample" evidence that he posed a flight risk due to his planning skills and experience with clandestine operations. *United States v. Taylor*, 524 F. App'x 386, 387 (10th Cir. 2013).

And since then, of course, Mr. Taylor is alleged to have used his skills and experience to plan and execute a most intricate, sophisticated, and deceptive scheme spanning several countries and most surely requiring massive expenditures of time and money. Even assuming Mr. Taylor now sincerely harbors a belief that he is not likely to be convicted or face a serious term of incarceration if extradited and convicted, and would intend to spend his time caring for his stepfather, those factors do not come close to mitigating the risk that would otherwise be posed by his release, particularly where he has strong ties to Lebanon and apparently has (along with Peter Taylor) substantial resources that could be exploited, including approximately $860,000 Ghosn appears to have wired in October 2019 to a limited liability corporation controlled by Peter Taylor and his brother. *See* D. 38. In light of these facts and the spectacular allegations underlying the Japanese case, the respondent does not merit the benefit of any doubt.

### 2. *Peter Taylor*

The court finds for similar reasons that Peter Taylor has not demonstrated by clear and convincing evidence that he would not flee if released.  Among other things, he has strong ties to Lebanon, completed his college education there, and in fact recently resided there while trying to establish the family's business.  Moreover, he reportedly played a significant role in facilitating Ghosn's escape from Japan.  This included traveling to Japan on multiple occasions to meet with Ghosn in advance of the escape and coordinating Ghosn's transition to the Grand Hyatt.  At a minimum the facts reflect a greater than passing experience in covert international planning.

## IV.  **CONCLUSION**

For the foregoing reasons, the Respondents' Motion To Quash Arrest Warrants Or, In The Alternative, For Release Pending Final Disposition On Request For Extradition (D. 17) is DENIED.

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  July 10, 2020